PER CURIAM.
In this second phase of Florida’s decennial legislative apportionment process, the Court’s constitutional obligation is to determine the validity of the apportionment plan set forth in Senate Joint Resolution 2-B (SJR 2-B). In that joint resolution, the Legislature adopted a revised plan apportioning Florida’s Senate districts after this Court declared the original Senate *877 apportionment plan to be constitutionally invalid. See In re Senate Joint Resolution of Legislative Apportionment 1176 (In re Apportionment Law — March 2012), 83 So.3d 597 (Fla.2012).
The declaratory judgment this Court entered on March 9, 2012, expressly declared invalid the Senate’s numbering scheme and eight Senate districts, Districts 1, 3, 6, 9, 10, 29, 30, and 34. Id. at 683. It also charged the Legislature with considering the feasibility of using the City of Lake-land’s municipal boundaries to keep that city wholly intact. Id. at 686. The Court then directed the Legislature to adopt a new joint resolution “conforming to the judgment of the supreme court” as set forth in article III, section 16(d), of the Florida Constitution. Id.
In accordance with the Court’s declaratory judgment, the Legislature reconvened by special session, the end result of which was the Legislature’s March 27, 2012, adoption of SJR 2-B. The Attorney General thereafter petitioned the Court to determine the validity of the revised Senate apportionment plan set forth in SJR 2-B. As in the original proceeding initially before this Court in In re Apportionment Law — March 2012, the Court is once again tasked with the mandatory obligation entrusted to us by article III, section 16(c), of the Florida Constitution to render a declaratory judgment determining the validity of the Legislature’s revised Senate plan.[1]
In reaching its decision, the Court has carefully considered the submissions of both those supporting and those opposing the plan.[2] The Court has also considered the alternative plans that both the Florida Democratic Party (FDP) and the Coalition have submitted in support of their arguments. Finally, the Court has held oral argument. For the reasons set forth in this opinion, we declare the redrawn plan apportioning the districts for the Florida Senate to be constitutionally valid under the Florida Constitution.
I. BACKGROUND
The Legislature originally passed Senate Joint Resolution 1176 (SJR 1176), ap *878 portioning this state into 120 House districts and 40 Senate districts on February 9, 2012. The next day, the Attorney General filed a petition in this Court for a declaratory judgment to determine the validity of the legislative apportionment plans contained within SJR 1176. Following the Attorney General’s filing, this Court “permitted] adversary interests to present their views,” as required by article III, section 16(c), of the Florida Constitution. The Court also permitted opponents of the legislative apportionment plans to submit alternative plans.[3]
In reviewing the validity of the apportionment plan, this Court first examined the historical evolution of article III of the Florida Constitution, noting that prior to 2010, the Court’s review was limited to determining whether the Legislature’s apportionment plans
complied with (1) the general provisions of the United States Constitution, which set forth the one-person, one-vote standard under the Equal Protection Clause, and (2) the specific provisions of the state constitution, article III, section 16(a), requiring districts to be “consecutively numbered” and to consist of “contiguous, overlapping or identical territory.”
In re Apportionment Law — March 2012, 83 So.3d at 598. A review of the Court’s precedent revealed that prior to 2010, Florida’s constitutional requirements were “not more stringent than the requirements under the United States Constitution.” Id. at 602 (quoting In re Constitutionality of House Joint Resolution 1987 (In re Apportionment Law — 2002), 817 So.2d 819, 824 (Fla.2002)).
After the voters approved Amendment 5 (Fair Districts Amendment) for inclusion in the Florida Constitution on November 2, 2010, the standards governing legislative apportionment “greatly expanded],” restraining “legislative discretion in drawing apportionment plans.” Id. at 599. The “overall goal” of this amendment was “[t]o require the Legislature to redistrict in a manner that prohibits favoritism or discrimination, while respecting geographic considerations” as well as “to require legislative districts to follow existing community lines so that districts are logically drawn, and bizarrely shaped districts ... are avoided.” Id. (quoting Advisory Op. to Att’y Gen. re Standards for Establishing Legislative Dist. Boundaries, 2 So.3d 175, 181, 187-88 (Fla.2009) (plurality opinion)). The Fair Districts Amendment — now codified in the Florida Constitution as article III, section 21 — imposed upon the Legislature “more stringent requirements as to apportionment than the United States Constitution and prior versions of the state constitution.” Id.
This Court succinctly summarized the new standards guiding the apportionment process of this state in the following manner:
The new standards enumerated in article III, section 21, are set forth in two tiers, each of which contains three requirements. The first tier, contained in section 21(a), lists the following requirements: (1) no apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent; (2) districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and (3) districts shall consist of contiguous territory. *879 The second tier, located in section 21(b), lists three additional requirements, the compliance with which is subordinate to those listed in the first tier of section 21 and to federal law in the event of a conflict: (1) districts shall be as nearly equal in population as is practicable; (2) districts shall be compact; and (3) where feasible, districts shall utilize existing political and geographical boundaries. See art. Ill, § 21(b), Fla. Const. The order in which the constitution lists the standards in tiers one and two is “not [to] be read to establish any priority of one standard over the other -within that [tier].” Art. Ill, § 21(c), Fla. Const.
Id. The Court then defined these new standards and the manner in which they interact. See id. at 614-41.
After extensively reviewing the various objections raised by opponents to the original House and Senate apportionment plans with these standards at the fore, the Court held “the challengers [had] demonstrated that the Senate plan, but not the House plan, violatefd] the constitutional requirements.” Id. at 684. The Court therefore entered a judgment declaring “the Senate plan constitutionally invalid and the House plan constitutionally valid.” Id. We agreed with the House that “[t]he language of Senate Joint Resolution 1176 established] that the Legislature intended the Senate and House plans to be severa-ble from each other in the event either plan was held invalid.” Id. “Because we [had] declared] the House’s apportionment plan to be valid, the only plan that need[ed] to be redrawn by the Legislature [was] the Senate plan.” Id.
As to this Court’s specific objections to the Senate plan, we concisely set forth our holding with the goal of providing direction to the Legislature:
We have held that Senate Districts 1, 3, 6, 9, 10, 29, 30, and 34 are constitutionally invalid. The Legislature should remedy the constitutional problems with respect to these districts, redrawing these districts and any affected districts in accordance with the standards as defined by this Court, and should conduct the appropriate functional analysis to ensure compliance with the Florida minority voting protection provision as well as the tier-two standards of equal population, compactness, and utilization of existing political and geographical boundaries. As to the City of Lakeland, the Legislature should determine whether it is feasible to utilize the municipal boundaries of Lakeland after applying the standards as defined by this Court.... Finally, we have held that the numbering scheme of the Senate plan is invalid. Accordingly, the Legislature should renumber the districts in an incumbent-neutral manner.
Id. at 686.
This Court’s holding was fourfold, directing the Legislature to (1) redraw the eight invalid districts and those districts affected by the redrawing with this Court’s interpretation of the standards as a guidepost; (2) conduct a functional analysis of voting behavior for the purposes of complying with Florida’s minority voting protection provision; (3) determine whether it would be feasible to utilize the municipal boundaries of the City of Lakeland after applying the standards as defined by this Court; and (4) adopt an incumbent-neutral numbering scheme. As to the remainder of the challenges, this Court concluded that the opponents of the Senate plan failed to establish any constitutional violation with respect to other districts, including Districts 4, 15, 25, 26, 28, 33, 35, 36, and 38. Id. at 676-78.
The Court did not instruct the Legislature to redraw the entire plan or to change other, unspecified districts, although we *880 recognized that correcting constitutional deficits as to certain districts may require changes to districts that were not specifically declared invalid. See id. at 686 (“The Legislature should remedy the constitutional problems with respect to these districts, redrawing these districts and any affected districts in accordance with the standards as defined by this Court....”). Indeed, the Court cautioned that “[i]n redrawing the apportionment plan, the Legislature [was] by no means required to adopt the Coalition’s alternative Senate plan.” Id. at 686. We expressed that our role was not one of “dictating] the apportionment plan that the Court would draw,” but one of “provid[ing] the Senate with sufficient guidance in our interpretation of the standards and our application of those standards.” Id. at 686. In other words, the Court “provided the Legislature with parameters for the application of the standards to the apportionment plan” and “attempted to provide the Legislature with direction as to the specific constitutional problems that ... [had] been proven and to the general problems with the entire Senate plan.” Id. at 685.
In response to this Court’s March 9, 2012, declaratory judgment, and in accordance with article III, section 16(d), the Governor called a fifteen-day special legislative apportionment session to enable the Legislature to “adopt a joint resolution conforming to the judgment of the supreme court.” Id. at 686 (quoting art. Ill, § 16(d), Fla. Const.). The Legislature reconvened to accomplish this task, during which several committee hearings and floor debates ensued.[4] At least one entire Senate committee hearing was dedicated to the issue of renumbering, after which the Senate decided upon a lottery method for randomly assigning districts with either even or odd numbers.
On March 27, 2012, the Legislature passed SJR 2-B, which again apportioned this state into forty Senate districts. The Legislature’s revised Senate plan redrew the eight previously invalidated districts and also changed the boundaries of multiple other districts, which the Senate asserts were the result of the changes made to the eight invalidated districts. Because of the Senate’s revisions, twenty-six of the original forty Senate districts were reconfigured in some manner, with the City of Lakeland now kept wholly within one Senate district. The revised Senate plan also randomly renumbered each legislative district, and no one challenges the new numbering or the process by which the districts were renumbered.
Following the passage of SJR 2-B, and pursuant to article III, section 16(c), the Attorney General has again petitioned this Court to determine the validity of the revised Senate apportionment plan contained in that joint resolution. This Court has “permitted] adversary interests to present their views.” Art. Ill, § 16(c), Fla. Const. “Under this Court’s plenary authority to review legislative apportionment plans, we now have ‘jurisdiction to resolve all issues by declaratory judgment arising under article III, section 16(c), Florida Constitution.’” In re Apportionment Law — March 2012, 83 So.3d at 600 (quoting In re Apportionment Law Appearing as Senate Joint Resolution 1 E, 1982 Special Apportionment Session (In re Apportionment Law — 1982), 414 So.2d 1040, 1045 (Fla.1982)).
*881 II. ANALYSIS
As we stated in our prior opinion, the “overarching question to be considered by the Court in this declaratory judgment proceeding is the constitutional validity of the plans contained within the Legislature’s joint resolution of apportionment.” Id. at 604 (citing In re Apportionment Law — 2002, 817 So.2d at 824; In re Apportionment Law — 1982, 414 So.2d at 1052). The Court makes this determination “by examining whether the Legislature has operated within the constitutional limitations placed upon it when apportioning the state’s legislative districts.” Id.
Although the Legislature’s apportionment plans “come to this Court with an initial presumption of validity,” the “process in apportionment cases is far different than the Court’s review of ordinary legislative acts, and it includes a commensurate difference in our obligations.” Id. at 606. “In this type of original proceeding, the Court evaluates the positions of the adversary interests, and with deference to the role of the Legislature in apportionment, the Court has a separate obligation to independently examine the joint resolution to determine its compliance with the requirements of the Florida Constitution.” Id. This Court is “responsible for measuring legislative acts ‘with the yardstick of the Constitution,’ ” id. at 607, and judicial relief is warranted “where the Legislature has Tail[ed] to reapportion according to federal and state constitutional requisites.’ ” Id. at 606 (quoting In re Apportionment Law — 2002, 817 So.2d at 824).
Opponents of the apportionment plan bear the burden of establishing a constitutional violation. See id. at 653 (“[T]he FDP has failed to satisfy its burden of proof with respect to these two districts.”). However, facial invalidity need not be proven beyond a reasonable doubt. See id. at 607. Instead, “this Court will defer to the Legislature’s decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements.” Id. at 608. “[Ujnderstanding that the Court’s responsibility is limited to ensuring compliance with constitutional requirements, and endeavoring to be respectful to the critically important role of the Legislature,” the Court’s “duty ‘is not to select the best plan, but rather to decide whether the one adopted by the legislature is valid.’ ” Id. (quoting In re Senate Joint Resolution 2G, Special Apportionment Session 1992 (In re Apportionment Law — 1992), 597 So.2d 276, 285 (Fla.1992)). “Where the legislative decision runs afoul of constitutional mandates, this Court has a constitutional obligation to invalidate the apportionment plan.” Id. at 609.
It is with this standard and the constitutional framework set forth in article III, sections 16 and 21, of the Florida Constitution in mind that we review the opponents’ various challenges to the revised Senate plan. We begin with an evaluation of the opponents’ generalized challenges. These challenges focus on improper intent and the functional analysis of minority voting behavior for the purposes of analyzing compliance with Florida’s minority voting protection provision. Then, we consider the challenges to individual districts brought by the opponents. Finally, we conclude that the opponents have failed to satisfy their burden of demonstrating any constitutional violation in this facial review.

A. General Challenges to the Revised Senate Plan

1. Intent to Favor or Disfavor a Political Party or an Incumbent
In the current proceeding, both the FDP and the Coalition allege that the Senate apportionment plan, as redrawn, im- *882 permissibly favors incumbents as a whole. These challenges, taken together, assert that the new plan avoids pitting incumbents against each other, the new plan retains the core of previous districts for multiple incumbents, and the partisan balance of the plan demonstrates a severe partisan skew.
In challenging the invalidated Senate plan in the prior proceeding, the opponents asserted similar challenges.[5] After considering the challenges, we did not direct the Legislature to redraw the entire Senate plan, but rather directed its attention to remedying specific constitutional deficiencies. In this proceeding, we must be mindful that we are reviewing the Senate plan after the Legislature has redrawn it pursuant. to our March 2012 decision. Here, the FDP and Coalition have failed to present new facts demonstrating the Legislature redrew the plan with an improper intent. In light of the posture of this case, this Court’s direction in its prior decision, and the facts in this record, we reject these challenges.
2. NAACP’s Challenge
The NAACP primarily asserts that this Court lacks sufficient evidence to undertake a functional analysis of minority voting behavior for the purposes of analyzing whether challenged districts comply with Florida’s provision prohibiting the dimin-ishment of racial or language minorities’ ability to elect representatives of choice. As areas of particular concern, the NAACP points to two black minority Senate districts, Redrawn District 9 in Duval County and Redrawn District 31 in Bro-ward County.
Although the NAACP acknowledges that a functional analysis does include a review of the types of data this Court previously considered,[6] the group nevertheless contends that where the minority population percentage of an “‘ability to elect’ district is lowered and pushed to the very edge of that ability,” a “risk” arises that the minority group will lack the ability to elect candidates of its choice. The NAACP asserts that in such an instance, the Legislature must demonstrate that the plan will not result in diminishment. The NAACP’s position erroneously inverts the burden of proof. See In re Apportionment Law — March 2012, 83 So.3d at 624 n. 26 (noting that Florida’s constitutional provision does “not incorporate the portion of Section 5 placing the burden of proof on the covered jurisdiction to establish the *883 requirements necessary to obtain preclearance”).
The information the NAACP requests this Court to consider, which includes data regarding endogenous[7] and racially contested elections to discern racial polarization, is undoubtedly relevant to a functional analysis of minority voting behavior. Nothing in our prior opinion precludes the Legislature from considering prospectively the type of information that the NAACP requests the Court to evaluate in this proceeding. Fatal to the NAACP’s claim, however, is the group’s acknowledgment that the information it wishes the Court to consider is not before this Court; the group expressly recognizes that “[t]his Court does not currently have before it a record sufficient to determine the extent that significant reduction of the black voting age population in a district would, in light of racially polarized voting, diminish the ability of black voters to continue electing their candidate of choice.”
The NAACP further advances that the 2010 United States Senate and the 2008 presidential elections results are probative in assessing the presence and extent of racially polarized voting, in that each election pits a black candidate against non-black candidates. However, the NAACP then concedes that the available data “does not include a sufficient number of racially-contested elections” and that the foregoing elections “are not overwhelmingly probative of the extent of racially polarized voting.” The NAACP’s contention that there is a “risk” in Florida that Redrawn Districts 9 and 31 will diminish the ability of black voters to elect representatives of their choice is not based on facts, but on speculation. In essence, the NAACP asserts that there is simply insufficient evidence from which to conclude that Redrawn Districts 9 and 31 will meet constitutional requirements. Because the NAACP’s position erroneously inverts the burden of proof in this proceeding, and the NAACP has not met its burden of proof, we reject all aspects of this claim.

B. Challenges to Individual Senate Districts

1. Barred Challenges
Both the FDP and the Coalition challenge numerous districts in this proceeding that the Court did not previously declare to be in violation of constitutional requirements and that the Legislature did not materially alter when it redrew the Senate plan. The Senate asserts that this second-phase proceeding is limited to reviewing only whether the Legislature complied with the Court’s specific mandate.
In its brief, the Senate asserts that the principle of res judicata applies to bar this Court’s consideration of challenges to districts that were not changed, although at oral argument the Senate focused on the notion of “fundamental fairness.” Specifically, the Senate argues that given the posture of these proceedings, it would be fundamentally unfair to allow opponents to object to unchanged districts because these arguments could have been presented in the opponents’ initial challenges and the Legislature no longer has the ability to remedy any defects this Court would now identify.
Where a judgment on the merits was reached in a prior action, the principle of res judicata will bar “a subsequent action between the same parties on the *884 same cause of action.” Youngblood v. Taylor, 89 So.2d 503, 505 (Fla.1956). Importantly, this rule also applies to claims that could have been raised in the former proceeding. Id. This Court has fully explained res judicata as follows:
Inhering in all courts of civilized nations and, as is said in one case, an obvious rule of expediency and justice, res adju-dicata is a fundamental doctrine universally recognized. No better enunciation of it, perhaps, can be found than that given by Black in his work on Judgments. He states it in two main rules, as follows: First, a point which was actually and directly in issue in a former suit, and was there judicially passed upon and determined by a domestic court of competent jurisdiction, cannot again be drawn in question in any future action between the same parties or their privies, whether the causes of action in the two suits be identical or different; and, Second, a judgment rendered by a court of competent jurisdiction, on the merits, is a bar to any future suit between the same parties or their privies upon the same cause of action, so long as it remains unreversed. Black on Judgments (2d Ed.) vol. 2, § 504.
Fla. Dep’t of Transp. v. Juliano, 801 So.2d 101, 105 (Fla.2001) (quoting McGregor v. Provident Trust Co., 119 Fla. 718, 162 So. 323, 327 (1935)). “Thus, the doctrine of res judicata provides finality to judgments, predictability to litigants, and stability to judicial decisions.” Id.
Res judicata, as well as the related concept of law of the case, are premised on the assumption that the parties have had the ability to raise all necessary claims and discover all necessary evidence to develop their cases. The Court’s review of legislative apportionment is significantly different from the traditional types of cases to which res judicata has been applied, which are traditional, adversarial proceedings.
In contrast to traditional, adversarial proceedings, the Court’s review of legislative apportionment under the Florida Constitution is unique. Based on the restrictive time frames under the Florida Constitution, together with other inherent limitations in the constitutional structure and the limited record before us, this Court announced that the review would be restricted to a facial review of the plan and that no rehearing would be permitted. As the Court explained:
The question then becomes how this Court will accomplish its review in a meaningful way given the nature of this constitutionally required proceeding. Undoubtedly, this Court is limited by time to be able to relinquish for extensive fact-finding as we have undertaken in other original proceedings, or to appoint a commissioner to receive testimony and refer the case back to the appellate court together with findings that are advisory in nature only.
In re Apportionment Law — March 2012, 83 So.3d at 609 (footnote omitted). After determining that the Court could perform a meaningful facial review based on the use of technology and a review of alternative plans, the Court concluded:
With our important responsibility to ensure that the joint resolution of apportionment comports with both the United States and Florida Constitutions, and with full awareness of the inherent limitations in the process set out in the state constitution, we undertake our constitutionally mandated review of the facial validity of the Senate and House plans contained within Senate Joint Resolution 1176.
Id. at 614.
There is no question that in now examining the redrawn districts, the Court is not *885 precluded from examining the plan as a whole to see if consistent principles were applied by the Legislature in drawing the overall plan. Yet, the Court will not ignore the effect of what occurred in our prior review, in which the Coalition and the FDP filed comprehensive briefs raising multiple facial challenges. Based on the issues raised, this Court reviewed the apportionment plan, determining, among other things, that specific Senate districts must be declared invalid and providing specific direction as to how to correct the problems. The Legislature’s task was then to pass a new joint resolution “conforming to the judgment of the supreme court.” Art. Ill, § 16(d), Fla. Const. The Legislature had only this one opportunity to correct any deficiencies.
Now, both the Coalition and the FDP raise new challenges concerning districts that they did not previously challenge and raise different challenges to some of the districts that they unsuccessfully challenged on other grounds. Permitting these parties to raise challenges that clearly could have been addressed in the first proceeding would allow a serial attack on the joint resolution in such a manner that it would require this Court, rather than the Legislature, to draw the apportionment plan. This would defeat the very purpose of article III, section 16, which gives to the Legislature the primary duty of drawing the plans and providing the Legislature with one chance to correct any deficiencies.
With similar reasoning, the Court addressed a comparable circumstance in a ballot summary case. See Advisory Op. to Att’y Gen. re Referenda Required For Adoption & Amendment of Local Gov’t Comprehensive Land Use Plans, 938 So.2d 501 (Fla.2006). There, the Court had previously held that the 2003 Proposed Amendment could not be placed on the ballot because the first sentence of the ballot summary was misleading and thus did not comply with section 101.161(1), Florida Statutes. See id. at 502 (citing Advisory Op. to Att’y Gen. re Referenda Required for Adoption & Amendment of Local Gov’t Comprehensive Land Use Plans, 902 So.2d 763 (Fla.2005)).
In response, the sponsor again invoked the petition process of article XI, section 3, to propose the same constitutional amendment, but this time removed the first sentence of the ballot summary of the 2003 Proposed Amendment, which the Court had previously found objectionable. Id. at 503. The opponents then challenged other terms in the ballot title and summary as also being misleading. The Court held as follows:
The opponents of the 2003 Proposed Amendment argued that the phrase “local government comprehensive land use plans” was misleading. We did not address this argument in Land Use Plans. However, because our opinions addressing citizen initiatives are intended to enable proponents to remedy any flaws in the ballot language, the fact that we found only the first sentence of the ballot summary defective indicates that we implicitly rejected other challenges to the ballot summary. To hold otherwise would allow serial attacks on a proposed amendment, thwarting a proponent’s efforts indefinitely.
... All alleged deficiencies with the terms in the ballot title and summary should have been raised in the first case in which we considered this proposed amendment. Allowing piecemeal attacks on a proposed amendment would not only be fundamentally unfair to the proponent of an amendment, it would be a misuse of the process for approval of citizen initiatives. Cf. Juliano, 801 So.2d at 105 (“[T]he doctrine of res judi- *886 cata provides finality to judgments, predictability to litigants, and stability to judicial decisions.”).
Id. at 505 (emphasis added).
For the reasons addressed above, we hold that res judicata does not apply in this case. However, we agree with the Senate that when reviewing this apportionment plan after portions of the initial plan were held to violate constitutional mandates, the Court must consider the fact that other districts were either not challenged or challenges to those districts were rejected.
Certainly the Court understands that the Florida Constitution imposes a critical obligation in the redistricting process to ensure that the .constitutional mandates are followed. However, the process must also work in an orderly and balanced manner. Although the challengers have asserted that the Court has discretion to review the entire plan, the Court’s decision did not require the Legislature to redraw the entire plan. It would be fundamentally unfair to entertain challenges in this second-phase proceeding that could have been made and were not, or to entertain challenges that were made and rejected, after the Legislature is no longer able to correct any alleged deficiencies.
Based on the reasoning above, we briefly look at the challenges made by the opponents to districts that were not materially changed in the redrawing to see if those challenges could have been raised earlier. First, the opponents challenge numerous districts that the Legislature did not change at all. Specifically, the Coalition challenges Districts 17, 19, and 22 in the redrawn Senate plan (Districts 15, 19, and 22 in the prior plan, respectively), asserting among other things that these districts should be declared invalid because they are an “egregious gerrymander in order to prevent the creation of what would otherwise be a naturally-occurring toss-up district in the area.” In addition, the Coalition challenges District 18 in the redrawn Senate plan (District 20 in the prior plan) as being non-compact and avoiding the use of existing political or geographical boundaries in order to favor a member of the House who has declared his candidacy for this open Senate district. In looking to the claims raised, the Coalition could have brought them in the prior proceeding. As it would be fundamentally unfair to entertain such challenges now, we do not consider them.
In addition, the opponents also challenge particular districts that were changed only minimally. We review such challenges to determine whether the basis of the challenge could have been raised in the prior proceeding. The FDP alleges that Redrawn District 32 (District 25 in the prior plan) is invalid because it is non-compact and is erroneously based on the communities of interest principle. The Coalition also challenges this district as being drawn ■ to benefit an incumbent. The FDP asserts that Redrawn District 39 (District 40 in the prior plan) is invalid because it is visually and statistically non-compact, crosses multiple geographical and political boundaries, and lacks a tier-one justification. The Coalition contends that the same district is non-compact and was drawn to favor incumbents and to confine the influence of Democratic votes to as few districts as possible. Although both of these districts underwent de minimis changes when the Legislature redrew the plans, the changes do not relate to the arguments raised. Thus, the parties do not get a second bite at the apple — in other words, a second challenge to virtually the same district — in this second-phase proceeding.
2. Districts Previously Invalidated, But Now Unchallenged
In our prior decision, we invalidated Districts 1 and 3 (now Redrawn Districts 1 *887 and 2) because when the Legislature drew these districts to create one rural and one coastal district, the resulting districts violated two constitutional standards: compactness and utilizing existing political and geographical lines where feasible. In re Apportionment Law — March 2012, 88 So.3d at 662. In response, the Legislature reconfigured these districts by following county and municipal boundaries. By doing so, the revised plan made both districts more visually compact, a conclusion that is also supported by the mathematical compactness scores. No party challenges either of these districts. We conclude that the Legislature properly complied with this Court’s mandate.
We also declared prior District 30 (which resembled an upside-down alligator) to be invalid because the district “violate[d] the Florida constitutional standards that districts ‘shall be compact’ and utilize political and geographical boundaries where feasible. Further, the failure to comply with the tier-two standards, in the absence of any constitutionally valid justification, objectively indicate[d] intent to favor an incumbent.” Id. at 672. The Legislature redrew this district, which is now Redrawn District 23. Based on the new configuration, the district is more visually compact and the mathematical scores for compactness bear this out. Further, although under the invalidated Senate plan, this district retained 84.9% of the population of its predecessor district, when it was redrawn to become more compact, that percentage dropped to 59.8%. No opponent challenges this district. We conclude that the Legislature properly complied with this Court’s mandate.
3. Non-Barred Challenges to Individual Districts

District 8 (Northeast Florida)

The Coalition and the FDP challenge Redrawn District 8 in northeast Florida. The FDP contends that Redrawn District 8 is invalid because it is non-compact and splits counties. The Coalition argues that Redrawn District 8 is invalid because it was configured with the intent to favor a political party and it splits the City of Daytona Beach. The crux of the Coalition’s claim is that the Legislature chose to split Daytona Beach’s Democratic community in order to favor the Republican Party in Districts 6 and 8. Both the FDP and the Coalition have submitted alternative plans to support their challenges. In its reply brief, the NAACP asserts that the newly revised plan is detrimental to black voters in Daytona Beach.
The districts presently challenged were reconfigured by the Legislature as a result of redrawing northeast Florida after this Court held that District 6 in the invalidated plan was unconstitutional. In revising the plan, Invalid District 6 became Redrawn District 9, Invalid District 9 became Redrawn District 6, and District 8 retained the same number. In light of the Legislature’s reconfiguration of Invalid District 6, the boundaries of which are now entirely within Duval County, the configurations of Districts 8 and 9 in the invalidated Senate plan (Redrawn Districts 8 and 6, respectively) were altered. District 7 to the northwest, a district consisting of and contained within three counties, remained unaltered. After the region was redrawn, Redrawn District 6 is now composed of three whole counties with additional population taken from northeast Volusia County, including part of the City of Daytona Beach.[8] Redrawn District 8 is located in *888 and divides three counties: Volusia, Lake, and Marion. It is these county and city splits, as well as the asserted non-compactness of Redrawn District 8, upon which the challengers rely.
The Senate justifies the decision to draw the boundary between Redrawn Districts 6 and 8 through Daytona Beach on the basis of the need to equalize population. In other words, rather than draw population from Clay County in District 7-and thereby altering a compact district that was previously unchallenged — when reconfiguring this area, the choice was made to enter Volusia County. During the Senate floor debate, the only alternative plan submitted for consideration and debate affected the northeastern region of Florida, including District 7, without a commensurate increase in compliance with Florida’s constitutional requirements. Both of the alternative plans submitted to this Court also substantially alter District 7, rendering Redrawn District 6 less compact and making other trade-offs in northeast Florida. See In re Apportionment Law— March 2012, 83 So.3d at 608 (recognizing that our duty “is not to select the best plan, but rather to decide whether the one adopted by the legislature is valid” (quoting In re Apportionment Law — 1992, 597 So.2d at 285)).
Further, although the Coalition asserts that “[b]y splitting Daytona Beach, which votes heavily Democratic, the Legislature was able to maintain Republican performance in Districts 6 and 8,” reconfiguring the districts in the manner under the alternative plans has only a minor effect on the political composition of Redrawn District 8 and little to no effect on Redrawn District 6. Redrawn District 8 is competitive under the Legislature’s plan and remains competitive in both of the alternative plans before this Court. In all three plans, Governor Scott (R) would have won the 2010 gubernatorial election, President Obama (D) would have won the 2008 presidential election, former Governor Crist (R) would have won the 2006 gubernatorial election, and registered Democrats would outnumber registered Republicans. Moreover, in all three plans, Redrawn District 6 remains a solidly Republican-performing district.
In light of the posture of this case and the fact that District 7 was previously unchallenged, is compact, and is composed solely of three whole counties and that reconfiguring this area requires making Redrawn District 6 less compact, we cannot conclude on the record in this second-phase proceeding that District 8 is facially invalid. The FDP and the Coalition have failed to carry them burden of proof to demonstrate that District 8 was drawn with the intent to favor a political party.

Districts 10, IB, and 14 (Orlando Area)

Redrawn Districts 10, 13, and 14 are challenged (Districts 13, 10, and 14 in the invalidated Senate plan, respectively). The Coalition contends that Redrawn Districts 10 and 13 were “tailor-made” for two incumbents and that the Legislature failed to eliminate the constitutionally suspect appendage. The FDP challenges Redrawn District 13 on the grounds that it is non-compact and still has an appendage. The FDP also summarily challenges Redrawn District 14 on the grounds of compactness.
These districts are located in the Orlando area, which was redrawn as a result of this Court invalidating District 10 (now Redrawn District 13) during the prior apportionment proceeding. This Court specifically invalidated District 10 in that plan (now Redrawn District 13) on the grounds that it was non-compact and appeared to be drawn to favor an incumbent who lived in the “appendage” located on the eastern side of the district. In re Apportionment *889 Law — March 2012, 83 So.3d at 671. The shape of District 10 was necessarily related to the shapes of neighboring minority Districts 12 and 14, but the Senate in drawing Districts 12 and 14 did not perform a functional analysis. See id. at 671 & n. 52. District 12 was “a coalition district with a 40.0% black [voting-age population (VAP) ] and 20.9% Hispanic VAP.” Id. at 671. District 14 was a “new Hispanic majority-minority district with a Hispanic VAP of 50.5%; there was no predecessor Hispanic majority-minority district in the 2002 Senate plan.” Id.
In redrawing the Orlando area, the Legislature conducted a functional analysis of the minority districts and evaluated whether they could be drawn more compactly and whether the appendage could be eliminated. This stands in stark contrast to the approach taken when drawing the now-invalidated Senate plan, in which “[n]oth-ing in the record reflect[ed] that the process of drawing the districts in this area recognized the importance of balancing the constitutional values.” Id. at 671-72. The Legislature redrew District 12 and slightly changed District 14, eliminating the narrow corridor between them. The Legislature concluded, however, that it could not completely eliminate the appendage without impairing minority voting rights in Districts 12 and 14, and it drew the resulting district (Redrawn District 13) east of Orlando by following county lines where possible.
The available evidence does not support the Coalition’s argument that Redrawn Districts 10 and 13 were “tailor-made” for two incumbents. Redrawn District 13 retains only 12.3% of its predecessor district, and two incumbents are located in Redrawn District 13. The Coalition’s assertion of an after-the-fact announcement that one of the incumbents would be moving to a neighboring district does not demonstrate on this record that the Legislature redrew these districts with impermissible intent.
The Coalition and the FDP’s alternative plans do not demonstrate that the redrawn Orlando districts are invalid. The Coalition’s plan does not eliminate the “appendage,” but rather configures it differently. The FDP’s alternative plan eliminates the appendage by incorporating it into Districts 12 and 14, reducing the black VAP in FDP District 12 to 31.3% and the Hispanic VAP in FDP District 14 to 46.5%. A functional analysis as to FDP District 12 raises concerns that the district will not perform as one in which black voters will likely have the ability to elect the representatives of their choice. FDP District 12 would perform Democratic,[9] but black voters would make up less than a majority of Democrats,[10] and black voters would not have controlled the Democratic primary (only 38.7% of the Democrats voting in the 2010 primary would have been black). Further, the reduction of District 14’s Hispanic VAP below a majority raises potential Section 2 issues.[11]
On this record, we conclude that the Coalition and the FDP have not carried their burden of proof to demonstrate that *890 the redrawn Orlando districts are constitutionally invalid.

Districts 21 and 26 (Heartland area)

The Coalition challenges Redrawn Districts 21 and 26. Specifically, the Coalition argues that a last-minute amendment was intended to provide safe, open seats for two Republican candidates (one a House representative, the other a former House representative) who would have otherwise had to run against one another in a Republican primary. These districts were initially redrawn as a result of the decision to make the City of Lakeland whole in the redrawn plan and were then amended during the Senate debate to move Plant City into a Hillsborough County district.
Contrary to the Coalition’s assertion, we conclude that the record does not demonstrate that an improper intent behind the amendment was “obvious.” The amendment not only moved Plant City, but it also made improvements to the plan. It moved the line of District 24 to follow a county boundary and also moved part of the boundary for District 21 to follow a county boundary where it did not before. In addition, the amendment improved the compactness of the affected districts.
This is not a situation where an odd-shaped district or appendage reaches out to clearly encompass an incumbent. See, e.g., In re Apportionment Law — March 2012, 83 So.3d at 671 (“[W]e conclude that District 10, which is visually non-compact and clearly encompasses an incumbent in an appendage, is constitutionally defective.”). Rather, the amendment made improvements — both with respect to following county boundaries and compactness— and was based on a logical justification. Finally, we note that both the Coalition and the FDP’s alternative plans also place the two candidates in separate Senate districts. On this record, we conclude that the Coalition has failed to carry its burden of proof.
The FDP also raises a challenge to Redrawn District 21 on a different basis, summarily asserting that while Redrawn District 21 is relatively compact according to quantitative measures, it is visually non-compact and crosses through a number of county boundaries. The FDP states that Redrawn District 21 was configured to favor an incumbent.
Although the FDP asserts that Redrawn District 21 was drawn to benefit an incumbent, it does not offer any supporting argument, but instead notes that neighboring Redrawn District 32 retains a high percentage of its prior population. The FDP relies on its alternative plan, which it claims is more compact. However, the FDP’s plan only makes slight improvements to the compactness of Redrawn District 21 and makes wide-sweeping changes to the surrounding area, including changes to a district to which we rejected a challenge in the last proceeding (Redrawn District 32, which was District 25 in the invalidated Senate plan). We conclude that the FDP has failed to establish a constitutional violation with respect to this district.
III. CONCLUSION
In the prior proceeding, this Court directed the Legislature to adopt a new joint resolution of legislative apportionment conforming to the judgment of the Court. Pursuant to this Court’s directive, the Legislature adopted a revised Senate apportionment plan that sought to remedy the constitutional infirmities apparent on the face of the invalidated Senate plan. In this proceeding, we conclude that the opponents have failed to demonstrate that the revised Senate plan as a whole or with respect to any individual district violates *891 Florida’s constitutional requirements. Therefore, pursuant to article III, section 16(c), of the Florida Constitution, the Court enters this declaratory judgment declaring the revised Senate apportionment plan as contained in Senate Joint Resolution 2-B to be constitutionally valid under the Florida Constitution.
No motion for rehearing shall be entertained. This case is final.
It is so ordered.
PARIENTE, LEWIS, and LABARGA, JJ., concur.
PARIENTE, J., concurs with an opinion.
CANADY, C.J., and POLSTON, J., concur in result.
PERRY, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.

. In the prior proceeding, we set forth the data and software we used in evaluating the apportionment plans and alternative plans. See In re Apportionment Law — March 2012, 83 So.3d at 610-12. In evaluating the revised Senate plan and alternative plans in this case, we used the same data and software, with the exception of utilizing Maptitude, and not ESRI, to generate Reock compactness scores.

. The following parties have filed briefs in opposition to the redrawn Senate plan: (1) the League of Women Voters of Florida, the National Council of La Raza, and Common Cause Florida (together "the Coalition”); (2) the Florida Democratic Party (FDP); and (3) the Florida State Conference of NAACP Branches (NAACP). The Florida Senate was the only party to file an answer brief.
The following parties filed comments. The City of Lakeland filed a comment stating that it supported the Senate districts as set forth in SJR 2-B, but requesting that the city be preserved within one district in the event this Court invalidated the plan. The Florida State Association of Supervisors of Elections filed a comment directed to the applicable time frames that Florida’s Supervisors of Elections are mandated to follow. The Secretary of State filed a comment providing a summary of various statutory deadlines and other legal requirements that pertain to Florida’s elections. This comment includes a discussion as to the Department of Justice’s preclearance of the five Florida counties covered under Section 5 of the Federal Voting Rights Act.
Finally, Marion County submitted a letter to the Court protesting the division of Marion County into three separate districts. Because the letter was received after the deadline for submissions had passed and did not otherwise comply with the Court’s March 13, 2012, scheduling order, the Court struck the letter and has not considered it in reaching its decision.

. In that proceeding, this Court received alternative plans from only one opponent, the Coalition. See In re Apportionment Law— March 2012, 83 So.3d at 610-11.

. The Senate Committee on Reapportionment met on three separate dates: March 14, 20, and 21, 2012. The Senate debated the revised apportionment plan on March 22, 2012. The House Redistricting Committee met on March 14 and 26, 2012. The House debated the revised apportionment plan on March 27, 2012.

. The FDP and Coalition asserted that the invalidated Senate plan as a whole violated the constitutional prohibition on intent to favor a political party or an incumbent because incumbent senators were interviewed by staff and asked about their districts before the districts were drawn, the plan as a whole over-packed Democrats into certain districts to prevent them from influencing other districts, the plan was designed to favor incumbents because no incumbent was paired against any other incumbent and the new districts retained large percentages of the population from their predecessor districts, and the numbering scheme of the Senate plan favored incumbents by providing them with longer terms than they would have ordinarily received. The Legislature has since renumbered the plan in an incumbent-neutral manner.

. In facially evaluating whether a given district would lead to diminishment under Florida law, this Court specifically considered the following relevant data sets: (1) voting-age population broken down by race; (2) political and minority-group breakdowns of the 2010 gubernatorial election; (3) political and minority-group breakdowns of the 2008 presidential election; (4) political and minority-group breakdowns of the 2006 gubernatorial election; (5) political and minority-group breakdown of voters from the 2010 general election, including both registered voters and those registered voters who actually voted; and (6) political and minority-group breakdowns of the 2010 primary elections.

. Endogenous races are elections in a single district that are held for the purpose of electing that district's legislative representative. Bone Shirt v. Hazeltine, 461 F.3d 1011, 1020 n. 8 (8th Cir.2006).

. Without this additional population, Redrawn District 6 would have been under-populated by more than 100,000 people.

. FDP District 12 would have voted 60.5% for Sink (D) in the 2010 gubernatorial election, 64.5% for Obama (D) in the 2008 presidential election, and 49.3% for Davis (D) in the 2006 gubernatorial election. Democrats would make up 50.1% of the registered voters.

. 44.9% of the Democrats would be black. As to the registered voters who actually voted in the 2010 general election, Democrats would make up 48.3% of the registered voters and 43.0% of the Democrats would be black.

.Because District 14 has no predecessor district, retrogression is not a concern in this proceeding.