# Supreme Court of Florida

No. SC22-131

## IN RE: SENATE JOINT RESOLUTION OF LEGISLATIVE APPORTIONMENT 100.

March 3, 2022

MUÑIZ, J.

The Florida Constitution requires the Legislature to reapportion our state into House and Senate districts after each decennial census. The Legislature did so this year by adopting Senate Joint Resolution 100 on February 3, 2022. Then, as the constitution commands, the Attorney General initiated this original proceeding for a declaratory judgment to determine the validity of the apportionment.[1] In what follows, we will explain our conclusion that the House and Senate apportionment in Senate Joint Resolution 100 is valid.

---

1. We have jurisdiction. Art III, § 16(c), Fla. Const. The constitution gives us 30 days from the Attorney General's February 9, 2022, filing to enter our judgment. *Id.*

## I.

This case comes to us in an unusual posture. The constitution requires our Court to hear from "adversary interests" on the validity of the Legislature's apportionment. Art. III, § 16(c). And ordinarily our role in this proceeding would be to adjudicate specific challenges to the joint resolution. *See In re Senate Joint Resolution of Legislative Apportionment 1176 (Apportionment I)*, 83 So. 3d 597, 601 (Fla. 2012) ("Before 1968, there was no process by which challengers to the Legislature's apportionment plans could seek direct and immediate review of the apportionment plans by the Supreme Court of Florida."). But, for the first time since the voters adopted the existing procedural framework for judicial review of apportionment in 1968, no one appeared to oppose the Legislature's plans.

Even without a challenging party, however, the constitution requires us to enter a judgment determining the validity of the apportionment. Art. III, § 16(c). We undertake that task mindful of a few foundational principles. First, the joint resolution of apportionment enjoys a "presumption of validity." *Apportionment I*, 83 So. 3d at 606. Second, and relatedly, it is not the Legislature's

burden to prove the validity of the apportionment. In a typical review proceeding under article III, section 16(c), "[o]pponents of [an] apportionment plan bear the burden of establishing a constitutional violation." *In re Senate Joint Resolution of Legislative Apportionment 2-B (Apportionment II)*, 89 So. 3d 872, 881 (Fla. 2012). Third, although the Legislature must exercise its discretion within the bounds set by the constitution, "legislative reapportionment is primarily a matter for legislative consideration and determination." *In re Apportionment Law Senate Joint Resolution No. 1305, 1972 Regular Session*, 263 So. 2d 797, 799 (Fla. 1972).

Our Court's duty under article III, section 16(c) is thus to enforce any discretion-limiting standards embodied in the constitutional text without curtailing the substantial discretion that those same standards, and our constitution's overarching separation of powers, still reserve to the Legislature. In this regard, the House and Senate maintain that we erred in 2012 by not requiring challengers to prove an apportionment's invalidity "beyond a reasonable doubt," and they ask us to reconsider that issue. We do not think that this uncontested proceeding is the

place to delve into the standard of review for future, hypothetical challenges. Instead, given the presumption of validity and in the absence of a challenge to Senate Joint Resolution 100, we will review the materials before us to ensure that there is evidence in the record to support the validity of the 2022 apportionment.

## II.

Our primary focus here is on article III, section 21 of the Florida Constitution, which prescribes what the text calls "standards for establishing legislative district boundaries." The voters of our state adopted these standards through the Fair Districts Amendment in 2010. That amendment substantially augmented the constitutional requirements that had governed reapportionment up to that time. *See In re Constitutionality of House Joint Resolution 1987*, 817 So. 2d 819, 832 (Fla. 2002) (listing then-governing constitutional requirements).

We have described article III, section 21 as consisting of two tiers, each with its own distinct standards. *Apportionment I*, 83 So. 3d at 614-15. The tier-one standards take precedence over those in tier two; but the order of the standards within each tier

"shall not be read to establish any priority of one standard over the other." Art. III, § 21(c).

The first of the tier-one standards prohibits intentional political favoritism: "No apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent." The next set of tier-one standards protects racial and language minority voters: "districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice." The final tier-one standard requires districts to "consist of contiguous territory." Art. III, § 21(a).

The tier-two standards address legislative districts' population, shape, and boundaries. Districts "shall be as nearly equal in population as is practicable"; they "shall be compact"; and they "shall, where feasible, utilize existing political and geographical boundaries." The constitution is explicit that, in the event of a conflict, the tier-two standards yield to the tier-one standards and to federal law. Art. III, § 21(b). Because the constitutional text does not set a hierarchy among the tier-two standards themselves, the

Legislature retains the discretion to balance those standards in the apportionment.

Of course, reapportionment is also governed by the Fourteenth Amendment's equal protection requirement of "one person, one vote." We have held that this requirement is subsumed within the population standard in tier two. *Apportionment I*, 83 So. 3d at 630. Finally, article III, section 16(a) of the Florida Constitution requires that House and Senate districts be "consecutively numbered" and that they consist of "either contiguous, overlapping or identical territory."

A.

We begin with the record facts that pertain to the tier-two standards in article III, section 16, because those standards are the ones that address the basic building blocks of reapportionment. The most fundamental consideration, of course, is population equality. The 2020 census recorded Florida's statewide population at 21,538,187 people, an increase of over 2.7 million people since 2010. The last decade's population growth was unevenly distributed, so both the House and the Senate district lines required substantial revision.

Neither the federal nor the Florida Constitution requires that districts contain perfectly equal populations. *Apportionment I*, 83 So. 3d at 630. In language that echoes the federal equal protection standard for state legislative districts, article III, section 21(b) requires districts "as nearly equal in population as is practicable." The text thus signals that the Legislature retains discretion to balance population equality with other legitimate redistricting considerations. In 2012, this Court approved House and Senate plans with overall population deviations[2] of 3.97% and 1.99%, respectively. *Apportionment I*, 83 So. 3d at 646, 655.

Here, the House plan has an overall population deviation of 4.75%. The Senate plan has an overall population deviation of 1.92%. Applying the federal standard, the Supreme Court recently observed that "[g]iven the inherent difficulty of measuring and comparing factors that may legitimately account for small deviations from strict mathematical equality, we believe that attacks on deviations under 10% will succeed only rarely, in unusual

---

2. A redistricting plan's overall population deviation is the sum of the percentages by which the plan's least and most populated districts deviate from a district's theoretical ideal population.

cases." *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016). Both the House and Senate explain that the population deviations in their 2022 plans were driven by respect for political and geographical boundaries, particularly county boundaries—an unquestionably legitimate consideration.

Next in tier two is the standard that "districts shall be compact." Art. III, § 16(b). In 2012, we held that compactness "refers to the shape of [a] district," and we explained that this standard seeks to "ensure that districts are logically drawn and that bizarrely shaped districts are avoided." *Apportionment I*, 83 So. 3d at 636. Of course, limiting the definition of compactness to an assessment of a district's shape does not eliminate the inherent vagueness of the term; however measured, compactness is a matter of degree. And a district's compactness can be affected by factors over which the line-drawer has no control, like our state's unique geographical contours and the distribution of population within the state. *See id.* at 635.

To evaluate districts' compactness in our 2012 review proceeding, this Court made a visual assessment of the districts and considered "quantitative geometric measures of compactness."

*Id.* at 634-35. Overall, the House and Senate districts in the Legislature's 2022 plans are visually at least as compact as the districts that they replace—in many cases more so. This conclusion is confirmed by the 2022 districts' generally improved average scores on the recognized Convex Hull, Polsby-Popper, and Reock compactness tests.[3] Without a presentation from adverse parties, we hesitate to comment on how meaningful those improvements are. What matters for present purposes is that, by recognized mathematical measures, the Legislature's 2022 districts overall are more compact than the districts in the existing, benchmark plan.

Finally, there is the tier-two standard that districts "shall, where feasible, utilize existing political and geographical boundaries." Art. III, § 21(b). Our Court has held that political boundaries are county and city boundaries. *Apportionment I*, 83 So. 3d at 638. And we held that the term "geographical

---

3. For an explanation of these tests, see our decision in *League of Women Voters of Florida v. Detzner*, 179 So. 3d 258, 283, nn. 6-8 (Fla. 2015). In each test, the highest score possible is 1.0. The House districts' benchmark and new average scores are (benchmark/new): 0.80/0.82 (Convex Hull); 0.43/0.45 (Polsby-Popper); and 0.43/0.45 (Reock). The corresponding Senate districts' benchmark and new average scores are: 0.81/0.82; 0.41/0.46; and 0.50/0.46.

boundaries" refers to those "that are easily ascertainable and commonly understood," like "rivers, roadways, interstates, and state roads." *Id.*

This redistricting cycle, both the House and Senate calculated the extent to which each district's boundary lines coincide with political and geographical boundaries. The results of this "boundary analysis" show that the average district in the new House plan follows political and geographical boundaries along 82.7% of its perimeter; the corresponding figure for the average district in the Senate's new plan is 96%. These figures show improvements over the boundary analysis scores of 78.5% and 89% for the average district in the existing House and Senate benchmark plans, respectively.

### B.

We now turn to the article III, section 21 tier-one standards that protect racial and language minority voting rights and prohibit intentional political favoritism.[4] The minority voting standards

---

4. The third and final tier-one standard is that districts must "consist of contiguous territory." Art. III, § 21(a). The maps submitted with the joint resolution show that the 2022 districts are contiguous.

identify and proscribe two types of discrimination: "impermissible vote dilution" and "impermissible diminishment of a minority group's ability to elect a candidate of its choice." *Apportionment I*, 83 So. 3d at 619. While they exist independently as Florida law, these provisions were modeled on and "embrace[] the principles" of key provisions of the federal Voting Rights Act of 1965, section 2 (vote dilution) and section 5 (diminishment, or retrogression). *Id.* at 619-21.

Vote dilution is "the practice of reducing the potential effectiveness of a group's voting strength by limiting the group's chances to translate the strength into voting power." *Id.* at 622. Line drawers can effect vote dilution either by fragmenting a specific minority voter population into multiple districts or by "packing" those voters into a district or districts. *Id.* We acknowledged in 2012 that "[a] successful vote dilution claim under Section 2 [of the Voting Rights Act] requires a showing that a minority group was denied a majority-minority district that, but for the purported dilution, could have potentially existed." *Id.*[5]

---

5. In voting rights parlance, a "majority-minority district" is one in which voters of a minority group constitute a majority of the

In our 2012 review proceeding, we evaluated potential vote dilution by looking for evidence suggesting impermissible "packing" of minority voters into super-majority districts to avoid the creation of additional majority-minority districts. *Apportionment I*, 83 So. 3d at 645. As for Black voters, no district in either 2022 plan has a Black voting age population sufficiently high to raise concerns of packing.[6] By contrast, it is true that both new plans have districts with high Hispanic voting age populations (HVAP): 93.99% in the highest HVAP House district, and 90.13% in the highest HVAP Senate district. But in 2012 we approved plans with comparably high HVAPs: 93.58% (House) and 86.9% (Senate). *Id.*; Att'y Gen.'s Petition Appendix at B5, *Apportionment II*, 89 So. 3d 872 (Fla. 2012)

_____

district's voting-age population. The existence of a minority group "sufficiently large and geographically compact to constitute a majority in [a] reasonably configured legislative district" is one of "three threshold conditions for proving vote dilution under" section 2 of the Voting Rights Act. *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017) (explaining the threshold vote dilution criteria established in *Thornburg v. Gingles*, 478 U.S. 30 (1986)). If the *Gingles* threshold factors are established, the dilution inquiry then proceeds to consider the totality of the circumstances.

6. The districts with the highest Black voting age population (BVAP) percentages in each plan have BVAPs of 57.94% (House) and 50.07% (Senate).

- 12 -

(No. SC12-460). We reasoned that these high percentages were attributable to the dense concentration of Hispanic voters in Miami-Dade County, not to impermissible line-drawing by the Legislature. *Apportionment I*, 83 So. 3d at 645.

Moreover, as to vote dilution, the House and Senate have represented that their 2022 plans do not avoid creating additional majority-minority districts where doing so was both possible and necessary to enable minority voters to elect representatives of their choice. We conclude that there is evidence in the record before us to support the conclusion that the Legislature's 2022 plans do not impermissibly dilute minority voting strength.

The non-diminishment protection afforded by article III, section 21(a) means that "the Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates." *Apportionment I*, 83 So. 3d at 625; *see also Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 802 (2017).[7] Evaluating the extent to which benchmark and

---

7. Governor Ron DeSantis recently sought an advisory opinion from this Court, in part seeking our views on the meaning

new districts perform for minority voters—that is, enable those voters to elect the candidate of their choice—requires a "functional analysis" of voting behavior within the districts at issue. Such analysis considers statistical data pertaining to voting age population; voter-registration data; voting registration of actual voters; and election results history. *Apportionment I*, 83 So. 3d at 625, 627. We have said that, "because a minority group's ability to elect a candidate of choice depends upon more than just population figures," a "slight change in percentage of the minority group's population in a given district does not necessarily have a cognizable effect on a minority group's ability to elect its preferred candidate of choice." *Id.* at 625.

During this redistricting cycle, the House and Senate each conducted a functional analysis of the minority performing districts in the benchmark and new plans. The House represents that its

and application of the non-diminishment standard in article III, section 21(a). For the reasons we explained in *Advisory Opinion to the Governor re Whether Article III Section 20(a) of the Florida Constitution Requires the Retention of a District in Northern Florida*, 47 Fla. L. Weekly S44 (Fla. Feb. 10, 2022), we declined to issue the advisory opinion. Our decision today should not be taken as expressing any views on the questions raised in the Governor's request.

benchmark and new plans contain 18 districts each that perform for Black voters and 12 districts each that perform for Hispanic voters. The record shows that, among the identified minority performing districts in the 2022 House plan, the number of majority-minority districts is unchanged from the benchmark plan.

The Senate represents that its benchmark and new plans contain five districts each that perform for Black voters and five districts each that perform for Hispanic voters. Of the five identified performing Black voter districts, one is majority minority in both the benchmark and 2022 Senate plans. The record further shows that four of the five identified performing Hispanic voter districts in the benchmark plan are majority minority, while all five of the identified performing Hispanic voter districts in the 2022 Senate plan are majority minority. The objective statistical data constitute support in the record for the Legislature's representation that the 2022 plans do not diminish minority voters' ability to elect representatives of their choice. *See id.* at 655 (no retrogression since "[t]here are as many Senate minority districts as there were under the 2002 Senate benchmark plan with what appears to be commensurate voting ability").

- 15 -

Finally, there is the tier-one standard that "no apportionment plan or district shall be drawn with the intent to favor or disfavor a political party or an incumbent." Art. III, § 16(a). It follows from the constitutional text that "there is no acceptable level of improper intent." *Apportionment I*, 83 So. 3d at 617. That said, we acknowledged in 2012 that "redistricting will inherently have political consequences," and we emphasized that the constitutional text "prohibits intent, not effect." *Id.* Consistent with these principles, we rejected a claim that an apportionment plan's partisan imbalance alone demonstrated an overall intent to favor a political party. *Id.* at 642.

Here the House and Senate represent that they drew their 2022 plans without regard to the addresses of incumbents and that they considered political data only as necessary to ensure compliance with minority voter protections. The Senate also represents that it drew its new apportionment plan without regard to preserving existing district boundaries. In addition, each chamber supports its plan by invoking reasoning that our Court itself has employed. They say that their compliance with the tier-two population, compactness, and boundary standards—

compliance that we have concluded is supported in the record—at least suggests that each plan also complies with the tier-one prohibition on intentional political favoritism. *See id.* at 645 ("[T]he House plan has complied with the tier-two standards, making improper intent less likely."). Reading the record in light of our precedents, we conclude that there is evidence in the record here to support the conclusion that the Legislature drew its 2022 plans without an impermissible intent to favor or disfavor a political party or incumbent.

### III.

Given the record before us, and in the absence of any filed opposition, we declare valid the House and Senate apportionment plans in Senate Joint Resolution 100.

The House and Senate ask us in this proceeding to go further and hold that the constitutional text, properly interpreted, precludes any future fact-based challenges to the 2022 apportionment plans that we have now declared valid. *See* Art. III, § 16(d), Fla. Const. ("A judgment of the supreme court of the state determining the apportionment to be valid shall be binding upon all the citizens of the state."). They argue that our Court has erred in

the past by drawing a distinction between "facial" challenges (the ones ostensibly at issue in a mandatory original proceeding under article III, section 16(c)) and fact-based or "as-applied" challenges (brought in subsequent proceedings). The chambers acknowledge that acceptance of their argument would require us to recede from our case law on that point, particularly the holding in *Florida House of Representatives v. League of Women Voters of Florida*, 118 So. 3d 198 (Fla. 2013). The Legislature has raised an important issue, but one that would be more appropriately considered in an original writ proceeding, if a fact-based challenge to the 2022 apportionment is filed.

No motion for rehearing will be entertained.

It is so ordered.

POLSTON, LAWSON, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., concurs in result.
CANADY, C.J., recused.

Original Proceeding - Legislative Apportionment

Ashley Moody, Attorney General, Henry C. Whitaker, Solicitor General, and Daniel W. Bell, Chief Deputy Solicitor General, Tallahassee, Florida,

for the Office of the Attorney General as proponents

Chris Sprowls, Speaker of the Florida House of Representatives, and J. Michael Maida, Acting General Counsel for the Florida House of Representatives, Tallahassee, Florida; Peter M. Dunbar and Marc W. Dunbar of Dean Mead & Dunbar, Tallahassee, Florida; and Andy Bardos of GrayRobinson, P.A., Tallahassee, Florida,

 for the Florida House of Representatives as proponents

Daniel E. Nordby, George N. Meros, and Tara R. Price of Shutts & Bowen LLP, Tallahassee, Florida, and Eric M. Yesner of Shutts & Bowen, LLP, Fort Lauderdale, Florida,

 for the Florida Senate as proponents