# Supreme Court of Florida

––––––––––

No. SC2023-1671

––––––––––

**BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE, INC., et al.,**
Petitioners,

vs.

**SECRETARY, FLORIDA DEPARTMENT OF STATE, et al.,**
Respondents.

July 17, 2025

MUÑIZ, C.J.

This case involves a challenge to Florida's 2022 congressional districting plan. The plaintiffs allege that the plan violates the Florida Constitution by failing to retain a two-hundred-mile-long congressional district encompassing several communities of black voters across North Florida. We uphold our state's congressional districting plan, because the federal Equal Protection Clause prohibits the racially gerrymandered district that the plaintiffs demand.

The plaintiffs in this case, petitioners here, are civic organizations and individual voters who challenge Florida's 2022 congressional districting plan (the Enacted Plan), Chapter 2022-265, Laws of Florida, under a provision of our state constitution known as the Fair Districts Amendment (FDA).  Art. III, § 20, Fla. Const.  The FDA says, among other things, that "[d]istricts shall not be drawn . . . to diminish [racial and language minorities'] ability to elect representatives of their choice."  *Id.* § 20(a).  The plaintiffs' claim is straightforward: the congressional districting plan in effect before the Enacted Plan included a North Florida district in which black voters were able "to elect representatives of their choice," as our Court has interpreted that phrase in the FDA; now, under the Enacted Plan, there is no North Florida district in which black voters (as a politically cohesive group) have that ability.

The Legislature and the Secretary of State, respondents here, defend the Enacted Plan principally on the ground that the North Florida district sought by the plaintiffs would be a racial gerrymander in violation of the Equal Protection Clause, which prohibits race-based districting without sufficient justification

(meaning that a district drawn predominantly for racial reasons would have to satisfy the Supreme Court's strict scrutiny test, which we later describe in detail). We stress at the outset that the plaintiffs allege neither intentional discrimination nor violations of the federal Voting Rights Act.

In the proceedings below, the trial court declared the Enacted Plan unconstitutional under the FDA, enjoined its use, and ordered the Legislature to adopt a remedial map. The First District Court of Appeal reversed, holding that the plaintiffs failed to prove the existence of a minority community in North Florida sufficiently compact to merit protection under the FDA. *Sec'y of State Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 375 So. 3d 335, 355-56 (Fla. 1st DCA 2023). We have exercised our discretion to review that decision, which expressly construed a provision of the Florida Constitution. Art. V, § 3(b)(3), Fla. Const.

## II

As we explain in more detail later, the parties in this case chose to forgo a trial. Instead, they stipulated to facts necessary to apply this Court's precedents interpreting the FDA, and the litigation focused primarily on whether the Legislature could honor

- 3 -

those precedents without running afoul of the Equal Protection Clause—an issue that our Court has not previously addressed. The Secretary, but not the Legislature, also urged an alternative interpretation of the FDA that would have made it unnecessary to address any Equal Protection Clause issue. We will therefore begin by explaining this Court's FDA precedents in sufficient detail to understand the parties' competing arguments about the validity of the Enacted Plan.

A

The Fair Districts Amendment is the product of a citizens' initiative that the people of Florida approved in 2010. It imposes identical substantive standards for drawing our state's congressional districts (article III, section 20, Florida Constitution) and legislative districts (article III, section 21, Florida Constitution). The FDA brought substantial change to our state's districting practices, most notably by prohibiting intentional political favoritism and regulating the shape of districts.

The FDA sets out its standards in two subsections. Subsection (a) says districts may not be drawn "with the intent to favor or disfavor a political party or an incumbent"; "districts shall

- 4 -

not be drawn [1] with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or [2] to diminish their ability to elect representatives of their choice"; and "districts shall consist of contiguous territory." Art. III, § 20(a), Fla. Const. Subsection (b) says "districts shall be as nearly equal in population as is practicable"; "districts shall be compact"; and "districts shall, where feasible, utilize existing political and geographical boundaries." *Id.* § 20(b).

The subsection (b) standards are mandatory "[u]nless compliance with [those standards] conflicts with the standards in subsection (a) or with federal law." Subsection (c) of the FDA says that "[t]he order in which the standards within subsections (a) and (b) . . . are set forth shall not be read to establish any priority of one standard over the other within that subsection." *Id.* § 20(b), (c).

As shown above, the FDA includes two clauses that expressly address "racial or language minorities." First, "districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process." *Id.* § 20(a). We have said that this clause

- 5 -

prevents "impermissible vote dilution," a concept derived from federal voting rights law. *In re Senate Joint Resol. of Legis. Apportionment 1176* (*Apportionment I*), 83. So. 3d 597, 619 (Fla. 2012). "[M]anipulation of district lines can dilute the voting strength of politically cohesive minority group members, [either] by fragmenting the minority voters among several districts where a bloc-voting majority can routinely outvote them, or by packing them into one or a small number of districts to minimize their influence in the districts next door." *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994) (citing *Voinovich v. Quilter*, 507 U.S. 146, 153-54 (1993)). This case does not require us to revisit or add to our precedents on the meaning and application of this clause of the FDA.

The second clause, the Non-Diminishment Clause, is the one at issue here. It reads: "[D]istricts shall not be drawn . . . to diminish [racial or language minorities'] ability to elect representatives of their choice." Art. III, § 20(a), Fla. Const. We have held that this clause includes a prohibition on districting changes that have the *effect* of diminishing minority voters' ability to elect representatives of their choice, regardless of whether the

Legislature acted with a discriminatory purpose. *Apportionment I*, 83 So. 3d at 623-27. No party has asked us to reconsider that conclusion.

Our precedent describes the Non-Diminishment Clause as a safeguard against impermissible "retrogression" in minority voting strength. *Id.* at 620. In the federal voting rights context, retrogression means a worsening "in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 130, 141 (1976). In turn, the "effective exercise of the electoral franchise," *id.*, relates to "the ability of minority groups to participate in the political process and to elect their choices to office," *id.* (quoting H.R. Rep. No. 94-196, at 60 (1975)).

Under our precedent, to determine whether a newly enacted districting plan complies with the Non-Diminishment Clause, one must compare the new plan to the plan that preceded it—the benchmark plan. The first step is to identify districts in the benchmark plan where "racial or language minorities" were able to elect representatives of their choice—call them "ability-to-elect districts." The second step is to determine whether, relative to that

benchmark, the new plan diminishes minority voters' ability to elect representatives of their choice. Of course, the notion of a racial or language minority group having representatives of "their choice" requires that there be some level of voting cohesion among the relevant minority group. The existence and extent of that cohesion within a benchmark or new district is something that must be proven; it cannot be assumed.

Our Court has interpreted the Non-Diminishment Clause as implicitly requiring a "functional analysis" to determine whether a racial or language minority group has, or can be expected to have, an ability to elect representatives of their choice in a district—an expectation that we have described as "whether a district is likely to perform for minority candidates of choice." *Apportionment I*, 83 So. 3d at 625. As we have explained it, a functional analysis requires "consideration not only of the minority population in the districts, or even the minority voting-age population in those districts, but of political data and how a minority population group has voted in the past." *Id.* Indeed, that analysis must also consider the voting patterns of a district's nonminority voters. *See League of Women*

- 8 -

*Voters of Fla. v. Detzner* (*Apportionment VIII*), 179 So. 3d 258, 286 n.11 (Fla. 2015).

Under our Court's precedents, whether a minority group constitutes a voting-age-population majority in a district is not dispositive of whether the group is or will be able to elect its candidates of choice in that district. The analysis instead assesses a cohesive minority group's effective voting strength, especially by asking whether the group controls the relevant primary election and the general election in the district under consideration. *See, e.g., id.*; *In re Senate Joint Resol. of Legis. Apportionment 2-B* (*Apportionment II*), 89 So. 3d 872, 889 (Fla. 2012). It was against this backdrop that our Court said that the Non-Diminishment Clause means that "the Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates." *Apportionment I*, 83 So. 3d at 625.

In *Apportionment I*, our Court acknowledged the possibility of a conflict between compliance with the Non-Diminishment Clause and adherence to the FDA's race-neutral districting principles. As

noted above, the FDA says that its subsection (b) criteria—compactness, population equality, and use of political and geographical boundaries—must be complied with unless there is a conflict with the subsection (a) standards or with federal law. Art. III, § 20(b), Fla. Const. Given the constitutional text, we observed that "in certain situations, compactness and other redistricting criteria, such as those codified in tier two of article III, section 21, of the Florida Constitution, will be compromised in order to avoid retrogression." *Apportionment I*, 83 So. 3d at 626.

We conclude this introductory summary of our Court's precedents by observing that, to determine the meaning of the FDA, our *Apportionment I* decision relied heavily on jurisprudence interpreting Sections 2 and 5 of the federal Voting Rights Act. *Id.* at 620. The decision looked to Section 2 on the issue of vote dilution and to Section 5 on the issue of diminishment or retrogression. Our Court gave two reasons for doing so. First, we noted that the text of the FDA mirrored parts of the text of the Voting Rights Act. *Id.* at 619-21. Second, we said that "all parties to th[e] proceeding"—a group that included the Attorney General and both chambers of the Legislature—"agree that Florida's constitutional

provision now embraces the principles enumerated in Sections 2 and 5 of the VRA." *Id.* at 620.

Our *Apportionment I* decision did not discuss evidence of the public's likely understanding of the relationship between the Voting Rights Act and the FDA. We came close to addressing the issue in a single sentence. Citing only an amicus brief filed in another case, we said: "Before its placement on the ballot and approval by the citizens of Florida, sponsors of this amendment, including the Florida State Conference of NAACP Branches (NAACP) and Democracia Ahora, acknowledged that Florida's provision tracked the language of Sections 2 and 5 and was perfectly consistent with both the letter and intent of federal law." *Id.*

The parties in this case have not offered their own evidence or analysis of the public's likely understanding of the meaning of the FDA provisions at issue. Nor have the parties questioned our Court's past reliance on Voting Rights Act jurisprudence to guide the interpretation of the FDA. Accordingly, we will take this aspect of our precedents as we find it.

B

This case centers on changes that the Enacted Plan made to Congressional District 5 (Benchmark CD 5) in the districting plan that was in effect from 2016 until 2022. Our Court ordered the adoption of that plan at the conclusion of litigation in 2015. The Almanac of American Politics described Benchmark CD 5 as having the shape of a "barbell." Richard E. Cohen, et al., *The Almanac of American Politics 2022*, at 452 (2021). It stretched over two hundred miles across the Florida/Georgia border to encompass the black populations in Duval County in the east and Leon and Gadsden Counties in the west; 60% of the district's population was concentrated at the eastern end and 30% at the western end. The district's other residents came from the sparsely populated counties in between. Under 2020 census figures, the black voting-age population (BVAP) of Benchmark CD 5 was 46.2%. In the trial court, the parties stipulated that, under the test established by this Court's precedents, "Black voters had the ability to elect the candidate of their choice in the district."

Given the district's importance to the case, it is necessary to understand how Benchmark CD 5 came to be. Its origins trace to a

district that was in effect only for the 1992 and 1994 elections and had been drawn by a federal court after the Legislature failed to adopt its own plan. The court purported to have been guided by two "primary factors": population equality and "the racial fairness of the plan." *DeGrandy v. Wetherell,* 794 F. Supp. 1076, 1083-84 (N.D. Fla. 1992). It mandated a plan with a horseshoe-shaped district that formed "a single serpentine corridor cutting through 39 municipalities and 14 counties" to include black voters from Gainesville, Jacksonville, Daytona Beach, and Orlando. *Johnson v. Mortham,* 915 F. Supp. 1529, 1550 (N.D. Fla. 1995). At its creation, the district had a BVAP of 50.6%, and it elected Corrine Brown to Congress. Former Congresswoman Brown would go on to represent the district (in various incarnations) continuously from 1992 until the 2016 election.

In 1996, voters challenged the district as a prohibited racial gerrymander under *Shaw v. Reno,* 509 U.S. 630, 657 (1993), which the Supreme Court had decided the year after the district was created. The plaintiffs won. The Legislature then drew a replacement district that stretched north to south from Jacksonville to Orlando. The district would go on to retain that basic

configuration for the next twenty years. At its creation, this version of the district had a BVAP of 42.3%. *Martinez v. Bush*, 234 F. Supp. 2d 1275, 1308 (S.D. Fla. 2002).

The Almanac of American Politics described the district as "grotesquely shaped," "a lengthy ribbon that stretches more than 140 miles from Jacksonville to Orlando, and cuts across much of this swampy terrain to connect various African-American enclaves throughout north and central Florida." Richard E. Cohen, et al., *The Almanac of American Politics 2016*, at 410, 434 (2015). The 2002 version of the district had a BVAP of 46.9% at its creation and 49.9% under 2010 census figures. A lawsuit was never brought to test the Jacksonville to Orlando district's constitutionality under *Shaw*. Albeit in the context of a federal voting rights lawsuit, the court in *Martinez* found that Corrine Brown was "the candidate of choice" of black voters in the district and that the district as drawn in 2002 likely would continue to "perform" for black voters. *Martinez*, 234 F. Supp. 2d at 1300-01.

The Jacksonville to Orlando district, still represented by Corrine Brown, was in effect when Florida's voters approved the FDA in 2010. The Legislature's 2012 congressional districting plan

retained the district's basic configuration. A lawsuit was then filed, alleging that Brown's district violated the FDA's compactness requirement and its prohibition on intentional partisan favoritism. The trial court agreed. The Legislature drew a remedial map that made modest changes to the district, and the trial court approved the remedy. An appeal in this Court followed.

Our Court rejected the Legislature's remedial plan. We held that a district that retained a Jacksonville to Orlando configuration would not cure the partisan gerrymander. But, because the Court and the parties agreed that any remedy would have to satisfy the Non-Diminishment Clause as interpreted by our Court in *Apportionment I*, there was only one alternative configuration that would continue to enable black voters to "elect representatives of their choice": "[T]he trial testimony was clear that the only way to get anywhere close to 45% BVAP in North Florida was a Jacksonville to Orlando district or a Jacksonville to Tallahassee district." *Romo v. Detzner*, No. 2012CA000412, 2014 WL 4261829, at *1 n.1 (Fla. 2d Cir. Ct. Aug. 22, 2014), *rev'd, League of Women Voters of Fla. v. Detzner* (*Apportionment VII*), 172 So. 3d 363 (Fla.

2015); *see also Apportionment VII*, 172 So. 3d at 403 ("[A]n East-West orientation is the only alternative option . . . .").

After concluding that an east to west district would satisfy the Non-Diminishment Clause, our Court sent the plan back to the Legislature. *Apportionment VII*, 172 So. 3d at 402-06. Justices Canady and Polston dissented. They agreed that the Non-Diminishment Clause protected the Corrine Brown district, but they argued that an east to west replacement would be substantially less compact and that the Court had disregarded evidence of the potential for retrogression. *Id.* at 422 (Canady, J., dissenting).

When the Legislature failed to adopt a remedy, and after additional proceedings in the trial court, our Court imposed an east to west district for use beginning in the 2016 election. *Apportionment VIII*, 179 So. 3d at 272. Our decision adopting the district reiterated that doing so would "not diminish the ability of black voters to elect a candidate of choice." *Id.* at 273. The result was Benchmark CD 5, which at the time of its creation had a BVAP of 45.1% under 2010 census figures.

Congressional elections were held in Benchmark CD 5 in 2016, 2018, and 2020. Each time, the district elected Al Lawson to

- 16 -

Congress.  In the proceedings below, the parties stipulated that "Lawson was the candidate of choice for Black voters in the district."  They further stipulated that black voters in the district were politically cohesive and that voting in the district's general elections was racially polarized.

C

The Legislature's post-2020 census congressional redistricting process began in late 2021.  Given the demographics and voting performance of Benchmark CD 5, applying our Court's precedents would have resulted in the conclusion that the district was a protected "ability-to-elect" district under the Non-Diminishment Clause.  But in February 2022, the governor's general counsel wrote the House redistricting committee to convey legal objections to drawing a new district configured like Benchmark CD 5.  He argued that racial considerations would predominate in drawing such a district; that the district would not satisfy strict scrutiny; and that, in any event, the Non-Diminishment Clause should be understood to protect only benchmark districts in which the relevant minority group makes up more than 50% of the voting-age population—a

criterion that Benchmark CD 5, with a 46.2% BVAP under 2020 census figures, did not meet.

To address the Governor's concerns, the Legislature took the unusual step of passing a redistricting bill with a primary plan and a backup plan. The primary plan (Plan 8019) replaced Benchmark CD 5 with a district located entirely within Duval County and having a 35% BVAP. The backup plan (Plan 8015), which would take effect only if the primary plan were to be struck down by a court, included a district substantially the same as Benchmark CD 5. The Governor vetoed the bill, explaining that "[a]s presented in both the primary and secondary maps enacted by the Legislature, Congressional District 5 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution."

Eventually, the Legislature passed and the Governor signed the Enacted Plan. It allocates the population of Benchmark CD 5 to four North Florida districts, none of which has a BVAP higher than 32%. The parties have stipulated that "[n]one of the Enacted districts in North Florida are districts in which Black voters have the ability to elect their preferred candidates."

D

The plaintiffs sued, and the parties conducted extensive discovery, but they ultimately agreed to forgo a trial. Instead, the parties stipulated to the above-described facts about the demographics and voting performance of Benchmark CD 5 and of the Enacted Plan's North Florida districts. Then, they jointly presented to the trial court a series of outcome-determinative legal questions.

Those questions were (1) whether the plaintiffs must satisfy the preconditions in *Thornburg v. Gingles*, 478 U.S. 30 (1986), for the Non-Diminishment Clause to apply—a question that goes to whether that provision protects only districts in which the relevant minority group is compact and a majority of the voting-age population; (2) whether drawing a non-diminishing district in North Florida would require the Legislature to violate the Equal Protection Clause; and (3) whether the "public official standing doctrine" precludes the defendants from raising Equal Protection Clause-based defenses to complying with the Non-Diminishment Clause. The parties also asked the trial court to rule on whether the Non-Diminishment Clause facially violates the Equal Protection Clause,

- 19 -

but that issue has been abandoned. The parties agreed that, if the plaintiffs were to prevail on the disputed legal questions, "an appropriate remedy to the diminishment in North Florida would join the Black community in Duval County with the Black community in Leon and Gadsden Counties."

The trial court ruled in favor of the plaintiffs on every contested legal issue. It held, among other things, that the Equal Protection Clause would not prohibit drawing a remedial district like Benchmark CD 5. Given its legal conclusions and the stipulated facts about Benchmark CD 5 and the Enacted Plan, the trial court declared the Enacted Plan to be in violation of the Non-Diminishment Clause, enjoined the use of the Enacted Plan, and returned congressional districting to the Legislature to adopt a remedial plan.

Sitting en banc, the First District Court of Appeal reversed the trial court's judgment, with two judges dissenting. The district court majority first concluded that this Court's past "pronouncements" about the meaning and application of the Non-Diminishment Clause had not established binding precedent. *Byrd,* 375 So. 3d at 349. It then held that "[t]he baseline or benchmark

- 20 -

from which to measure diminishment starts with a naturally occurring, geographically compact community with inherent voting power—not a district drawn with the *purpose* of cramming in enough voters to meet a BVAP target." *Id.* at 354. The district court faulted the plaintiffs for not proving at the threshold that they were part of a "naturally occurring community" that had "achieved some cohesive voting power under a legally enforceable district." *Id.* at 355-56. And the court concluded that the trial court should have dismissed the plaintiffs' complaint for failure to establish a benchmark district protected by the Non-Diminishment Clause. *Id.* at 356.

In an opinion concurring in the judgment, Chief Judge Osterhaus said that he would have ruled against the plaintiffs "for federal equal protection-related reasons." *Id.* at 356 (Osterhaus, C.J., concurring). "Because the FDA's diminishment clause would apply an overtly race-based redistricting scheme," the chief judge reasoned, "the Legislature and Governor had to decide in 2022 if federal law permitted them to divvy up North Florida voters into districts by race." *Id.* at 358. Chief Judge Osterhaus said that "the FDA's diminishment clause could only require the purposeful

redrawing of a black-voter performing district across North Florida if evidence showed a compelling remedial need for it." *Id.* at 361. But, given "the evidentiary vacuum" on the facts necessary to satisfy strict scrutiny, he concluded that the Equal Protection Clause would not allow a court to impose a Non-Diminishment Clause remedy in this litigation. *Id.*

### III

Before we turn to the merits of this case, we must address the First District's mistaken view that it was not bound by this Court's decisions interpreting and applying the Non-Diminishment Clause in *Apportionment I, II, VII*, and *VIII*. As we just explained, the First District held that the plaintiffs failed to prove at the threshold that Benchmark CD 5 was a protected "ability-to-elect" district. The district court made no effort to square that conclusion with the retrogression analysis we established in *Apportionment I* or with *Apportionment VII*. In the latter case, every justice of this Court agreed that former Congresswoman Brown's district—which would not have met the First District's "ability-to-elect" test—was protected by the Non-Diminishment Clause.

The district court did not expressly reject the foundational premise that "[w]here an issue has been decided in the Supreme Court of the state, the lower courts are bound to adhere to the Court's ruling when considering similar issues, even though the court might believe that the law should be otherwise." *State v. Dwyer*, 332 So. 2d 333, 335 (Fla. 1976). Instead, unprompted by the parties, the First District deemed our *Apportionment I* and *II* decisions not binding because we issued them in an original proceeding under article III, section 16 to conduct a facial review of state legislative districts, rather than in our appellate capacity. *Byrd*, 375 So. 3d at 347. And the First District convinced itself that our Court "in essence viewed *Apportionment I* and *Apportionment II* as decisions of limited application, with no real purchase in a direct appeal from a trial court judgment on an *as-applied* FDA challenge to *congressional* districts." *Id.* at 348 (citations omitted).

The First District's reasoning ignored what our Court said and did in our earlier decisions. Near the end of our opinion in *Apportionment I*, we said: "This Court understands that its obligations are not just to rule on the facial validity of the standards in this case, but to ensure that this decision charts a reliable

- 23 -

course for the Legislature and the judiciary to follow in the future." *Apportionment I*, 83 So. 3d at 684. Then, we applied our *Apportionment I* precedent in deciding *Apportionment VII* and *VIII*, which involved litigation over an as-applied challenge to a congressional districting plan.

In *Apportionment VII*, our Court expressly invoked the retrogression analysis established in *Apportionment I* to explain why a Jacksonville to Tallahassee district would not diminish minority voting strength relative to the benchmark Jacksonville to Orlando district. 172 So. 3d at 405 n.13. In *Apportionment VIII*, we corrected the parties for not following our Court's *Apportionment I* "test for retrogression." 179 So. 3d at 280, 285-87, 286 n.11. So, in addition to flouting the substance of our decisions, the First District disregarded our Court's precedent on precedent.

Apart from that, the First District's thinking is unpersuasive as a matter of first principles. The district court cited no authority for the proposition that decisions this Court issues in its original jurisdiction are not binding on lower courts. And there is no reason why such decisions are not binding. The district courts' duty to follow our precedents stems from the hierarchical structure

- 24 -

established in our constitution and from this Court's express authority to review certain district court decisions, including those that conflict with our decisions or that expressly construe constitutional provisions. Art. V, § 3(b)(3), Fla. Const. The authority of our decisions does not depend on the procedural posture of the cases in which they are issued. Indeed, as a practical justification for demanding lower courts' adherence to our decisions, our Court has emphasized fairness to litigants and the benefits of regularity and predictability in lower court litigation. *Hoffman v. Jones*, 280 So. 2d 431, 434 (Fla. 1973) ("To allow a District Court of Appeal to overrule controlling precedent of this Court would be to create chaos and uncertainty in the judicial forum, particularly at the trial level. Ever since the District Court rendered its opinion [attempting to overrule precedent,] there has been great confusion and much delay . . . ."); *Hernandez v. Garwood*, 390 So. 2d 357, 359 (Fla. 1980) ("[The trial judge] is wrong in asserting his personal construction of the law in the face of authoritative determinations to the contrary by this Court, and his exercise in judicial independence has cost these litigants and

the judicial system considerable time and money which should not have been expended.").

The First District was also wrong to downplay the reliability of the decisions we issue when we review state legislative districts under article III, section 16. The constitution requires us in those proceedings to "permit adversary interests to present their views." Art. III, § 16(c), Fla. Const. The process culminates in our issuance of a "declaratory judgment." *Id.* And the constitution says that a judgment determining an apportionment to be valid "shall be binding upon all the citizens of the state." *Id.* § 16(d). The decisions that emanate from the article III, section 16 process are informed by the adversarial process, they are thoroughly considered, and they are precedential.

Even when a district court disagrees with a decision of this Court, it is the lower court's duty to follow our precedent. In appropriate cases, the district court may pass upon and certify a question of great public importance for our review. We reject the First District's contrary approach.

Finally, we remind all district courts of their constitutional authority to certify for this Court's direct review trial court

- 26 -

judgments in which an appeal is pending and which are of "great public importance" or "have a great effect on the proper administration of justice throughout the state." Art. V, § 3(b)(5), Fla. Const. The First District followed that path in 2015 when it certified to our Court the trial court judgment invalidating the Legislature's 2012 congressional districting plan. *Apportionment VII*, 172 So. 3d at 387. The parties in this case jointly asked the First District do the same here, to no avail. Had the district court honored the parties' request, this dispute could have been resolved before the 2024 election cycle.

IV

The parties' arguments frame two distinct issues for our Court to decide. The first involves the Secretary's argument that we should recede from our Court's precedents on the test for identifying which districts in a benchmark plan are protected by the Non-Diminishment Clause. The second is about the relationship between the Non-Diminishment Clause and the Equal Protection Clause. We will take up these issues in turn.

A

Under our precedents, the first step in applying the Non-Diminishment Clause is to identify districts in the benchmark plan where racial or language minorities had the ability to elect representatives of their choice. In *Apportionment VIII*, we explained that our "test" for identifying those districts considers three variables: whether the minority voters encompassed within a benchmark district vote cohesively; whether the minority candidate of choice is likely to prevail in the relevant contested party primary; and whether that candidate is likely to prevail in the general election. 179 So. 3d at 286 n.11. The test is not always easy to apply—in some cases, it can be difficult to measure a minority group's cohesiveness, to identify a group's "representatives of choice," or to assess a group's functional voting strength, which of course depends in part on nonminority voting patterns. *See generally* Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act,* 117 Yale L.J. 174 (2007). But here, the parties have stipulated that Benchmark CD 5 was a protected ability-to-

elect district under our Court's existing test.[1]  Understandably, the plaintiffs ask us to adhere to our precedent on that issue.

The Secretary (not the Legislature) advocates a different test. He says that, properly understood, the Non-Diminishment Clause protects only groups of minority voters that are sufficiently large and geographically compact to constitute a voting-age-population majority in a reasonably configured district.  These criteria make up "precondition one" from the test the Supreme Court uses in vote dilution cases under Section 2 of the Voting Rights Act.  *Gingles*, 478 U.S. at 50-51; *Wis. Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 402 (2022); *Bartlett v. Strickland*, 556 U.S. 1, 11 (2009).[2]  In such cases, the plaintiffs seek to compel the creation of a majority-minority district in addition to any that the jurisdiction has already

---

1.  Given the parties' stipulations, our decision today breaks no new ground on how to conduct a functional analysis of a minority group's cohesion, candidate preferences, or voting strength.

2.  The other two *Gingles* preconditions are that the minority group must be politically cohesive, and a majority group must vote sufficiently as a bloc to enable it usually to defeat the minority group's preferred candidate.  If the preconditions are established, the court then considers the totality of circumstances to determine whether the political process is equally open to minority voters. *Wis. Legis.*, 595 U.S. at 402.

drawn. The role of *Gingles* precondition one is to provide "an objectively reasonable alternative practice as a benchmark for the dilution comparison." *Holder v. Hall*, 512 U.S. 874, 887 (1994) (O'Connor, J., concurring in part and concurring in the judgment). If it is not possible to draw an additional district that meets the *Gingles* preconditions, the plaintiffs in a vote dilution case under Section 2 cannot prove that the challenged districting scheme dilutes their voting strength.

The Secretary offers two principal arguments in support of his interpretation of the Non-Diminishment Clause. First, he says that the voters who approved the FDA would have understood that minority groups possess the ability to elect their representatives of choice only when they satisfy the *Gingles* precondition one criteria. Second, he says that a 2006 amendment to the Voting Rights Act incorporated *Gingles* precondition one into the test for triggering protection under Section 5, making the same true for the Non-Diminishment Clause.

We do not think the Secretary has demonstrated that our Court's existing test for identifying protected benchmark districts under the Non-Diminishment Clause is clearly erroneous, the

- 30 -

threshold that must be met before we will consider whether to recede from precedent. *State v. Poole*, 297 So. 3d 487, 507 (Fla. 2020) (explaining this Court's approach to horizontal stare decisis). The Secretary's arguments do not purport to be based on the plain language of the Non-Diminishment Clause. He has produced no evidence that the framers or the voters understood the clause to mean what he says it means. And he advances an interpretation of the 2006 amendments to Section 5 that has no support in federal case law or administrative practice—indeed, the argument is based primarily on contested legislative history. *See* Persily, *supra*, at 191 (Among senators, "[o]n the fundamental question of what the major new requirement in the law (the retrogression standard) meant, the Republicans believed it only protected 'naturally occurring majority-minority districts,' while the Democrats considered it to protect a greater variety of districts with varying percentages of racial minorities."). Even if we were to accept the Secretary's premise that the Non-Diminishment Clause "mirrors Section 5," legislative history alone is not enough to cause us to reconsider what our Court held in *Apportionment I, II, VII,* and *VIII.*

B

The ground we have covered so far establishes that, applying this Court's precedents, (1) Benchmark CD 5 was a protected ability-to-elect district for black voters, and (2) the Enacted Plan diminishes that ability to elect. But that does not resolve the parties' dispute over the validity of the Enacted Plan. When the Legislature undertook the task of congressional redistricting after the 2020 census, its obligation to comply with the Non-Diminishment Clause was bounded by its superior obligation to comply with the Equal Protection Clause. The remaining question is whether the Legislature could have drawn new North Florida districts that complied with both the Non-Diminishment Clause and the Equal Protection Clause. Importantly, our precedents did not address this aspect of the relationship between these provisions of state and federal law.

1

The plaintiffs argue at the threshold that the "public official standing doctrine" precludes the Legislature and the Secretary of State from raising an Equal Protection Clause defense of the Enacted Plan. That doctrine traces to our Court's decision in *State*

*ex rel. Atlantic Coast Line Railroad Co. v. State Board of Equalizers*, 94 So. 681 (Fla. 1922). It stands for the proposition that "a public official may not defend his nonperformance of a statutory duty by challenging the constitutionality of the statute." *Crossings at Fleming Island Cmty. Dev. Dist. v. Echeverri*, 991 So. 2d 793, 797 (Fla. 2008).

The public official standing doctrine does not apply in this case, because the government is defending a statute (i.e., the Enacted Plan), not challenging one. And we decline to extend the doctrine to the circumstances here, especially considering the strong public interest in avoiding continued uncertainty over the validity of Florida's congressional districts. We must therefore proceed to examine the Equal Protection Clause standards governing a legislature's consideration of race in making districting decisions.

2

The Equal Protection Clause says that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Amend. XIV, § 1, U.S. Const. In the redistricting context, the Supreme Court has interpreted this to mean that a "State may not

use race as the predominant factor in drawing district lines unless it has a compelling reason." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). "Under the Equal Protection Clause, districting maps that sort voters on the basis of race 'are by their very nature odious.' " *Wis. Legis.*, 595 U.S. at 401 (quoting *Shaw*, 509 U.S. at 643).

If a district were to be challenged as a racial gerrymander, the Equal Protection Clause inquiry would proceed in two steps, focusing first on the legislature's "predominant motive for the design of the district as a whole." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017). The threshold question would be whether "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* at 187 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). "The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Id.* at 189-90.

The Supreme Court has said that race predominates in the drawing of a district when a legislature "subordinate[s] traditional

race-neutral districting principles . . . to racial considerations." *Id.* at 187 (alteration in original) (quoting *Miller*, 515 U.S. at 916). Importantly, "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering." *Id.* at 190. "[I]f race for its own sake is the overriding reason for choosing one map over others, race still may predominate." *Id.*

The second step of the Equal Protection Clause analysis applies once it has been shown that "racial considerations predominated over others." *Cooper*, 581 U.S. at 292. At that point, "the design of the district must withstand strict scrutiny." *Id.* (citing *Bethune-Hill*, 580 U.S. at 191). The Supreme Court recently described strict scrutiny as a "daunting" examination that asks whether a "racial classification is used to 'further compelling governmental interests' " and then "whether the government's use of race is 'narrowly tailored'—meaning 'necessary'—to achieve that interest." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 206-07 (2023) (citation omitted). The Court added that the constitutional principle against "race-based

state action" is one that "cannot be overridden except in the most extraordinary case." *Id.* at 208.

If a government were to invoke remedying past or present discrimination as a basis for drawing a race-predominant district, the Supreme Court's precedents would require it to identify the discrimination with specificity in advance. *Shaw v. Hunt*, 517 U.S. 899, 909 (1996). And, before embarking on its program, the government would need a "strong basis in evidence" to conclude that remedial action is necessary. *Id.* at 910 (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986)). In *Hunt*, the Supreme Court concluded that a generalized "effort to alleviate the effects of societal discrimination is not a compelling interest" justifying race-based districting, because such an aim "provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id.* at 909-10 (citation omitted).

3

The plaintiffs maintain that the Legislature has a compelling interest in complying with the Non-Diminishment Clause. But, under the strict scrutiny framework we have just described, they are wrong. The Non-Diminishment Clause is a component of the

- 36 -

FDA, which originated as a citizens' initiative. There is no pre-enactment record identifying the discrimination—past or present, public or private—that the Non-Diminishment Clause is meant to remedy. Nor is there pre-enactment documentation of the evidence necessary to establish a proper connection between the amendment's means and ends. The obligation to comply with the Non-Diminishment Clause would not of its own force give the Legislature a compelling interest in drawing a race-predominant district.

Were it to choose to draw a race-predominant district—whether to comply with the Non-Diminishment Clause or for any other reason—the Legislature itself would have to specify and justify the compelling interest, with a fresh evidentiary record. Given the Legislature's constitutional role as the primary policy maker in our state, whether to take on that burden is a matter for the Legislature's discretion. One thing is certain: The Legislature could not establish a compelling interest for race-based districting simply by pointing to the existence of the FDA.

It is true that the Supreme Court has long assumed that states have a compelling interest in complying with Section 5 of the

Voting Rights Act. *Bethune-Hill*, 580 U.S. at 193.[3] But the Court has done so because of the Supremacy Clause, which "obliges the States to comply with all constitutional exercises of Congress' power." *Bush v. Vera*, 517 U.S. 952, 991-92 (1996) (O'Connor, J., concurring). As Justice Scalia explained, "[i]f compliance with § 5 were not a compelling state interest, then a State could be placed in the impossible position of having to choose between compliance with § 5 and compliance with the Equal Protection Clause." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 518 (2006) (Scalia, J., concurring in the judgment in part and dissenting in part).

Moreover, as Chief Judge Osterhaus explained in his concurrence below, Section 5 and the Non-Diminishment Clause stand on different footing. Congress enacted the Voting Rights Act under its express authority to enforce the guarantees of the

---

3. The Supreme Court's decision in *Shelby County v. Holder* invalidated the coverage formula that the Voting Rights Act uses to identify the jurisdictions subject to Section 5, but the Court did not issue any holding on the constitutionality of Section 5 itself. 570 U.S. 529, 557 (2013). Section 5, which applied to only five counties in Florida (none in North Florida), has been inoperative since the *Shelby County* decision.

Fifteenth Amendment. Amend. XV, § 2, U.S. Const. It documented the need for Section 5's race-based remedies with a voluminous record, including "reliable evidence of actual voting discrimination in a great majority of the States and political subdivisions affected by the new remedies of the [Voting Rights] Act." *South Carolina v. Katzenbach*, 383 U.S. 301, 329 (1966). And Congress aimed Section 5 at jurisdictions where voting discrimination had "persist[ed] on a pervasive scale." *Id.* at 308. By contrast, the Non-Diminishment Clause is untethered to documented findings of intentional discrimination, past or present. And, unlike the Voting Rights Act, the Non-Diminishment Clause lacks features tying its continued existence to the persistence of intentional discrimination in the future.

4

Against that backdrop, we can now assess the plaintiffs' demand that we compel the Legislature to draw a district that will avoid diminishing the ability of black voters in North Florida to "elect representatives of their choice," under our Court's interpretation of the Non-Diminishment Clause. As we have explained, the Legislature's obligation to comply with the Non-

Diminishment Clause is not sufficient justification to draw a race-predominant district. Put differently, compliance with the Non-Diminishment Clause is not a compelling governmental interest under the test established in the Supreme Court's Equal Protection Clause jurisprudence. Accordingly, this case boils down to whether it is possible to grant the plaintiffs their requested relief without requiring the Legislature to draw a race-predominant district. That, in turn, requires us to decide which party bore the burden of persuasion on that issue. We conclude that the plaintiffs had that burden.

The Enacted Plan, like any legislation, is entitled to a presumption of validity. And "[t]he Legislature is of necessity, in the first instance, to be the judge of its own constitutional powers." *Cotten v. Leon Cnty. Comm'rs*, 6 Fla. 610, 616 (1856) (quoting *Cincinnati, W. & Z.R. Co. v. Clinton Cnty. Comm'rs*, 1 Ohio St. 77, 83 (1852)). We must presume that the Enacted Plan reflects the Legislature's considered judgment that its superior obligation under the Equal Protection Clause prevented it from drawing a district to avoid diminishment in North Florida. It is axiomatic that, under

the Supremacy Clause, "[s]tate legislation may not contravene federal law." *Shelby Cnty.*, 570 U.S. at 542.

To establish the invalidity of the Enacted Plan, the plaintiffs bore the burden of proving the possibility of drawing a North Florida district that is both non-diminishing and non-race-predominant. And the plaintiffs had to do so with an alternative map. As indicated in our *Apportionment I* decision, it is not enough in the redistricting context for challengers to identify a flaw in an enacted districting plan and demand that the court send the Legislature back to the drawing board. The plaintiffs were required to produce an alternative plan proving that any asserted defect in the Legislature's plan is remediable. *See, e.g.*, *Apportionment I*, 83 So. 3d at 648, 650, 653, 664. They did not satisfy that burden in the proceedings below.

5

Ordinarily, the plaintiffs in a case like this would present an alternative map at trial where the map and its creator would be subject to adversarial testing. But, as we have explained, the parties in this case chose to forgo a trial. The plaintiffs joined a stipulation that, if they were to prevail on the legal questions the

parties had presented to the trial court, "an appropriate remedy to the diminishment in North Florida would join the Black community in Duval County with the Black community in Leon and Gadsden Counties to create a North Florida district that satisfies *Apportionment I* and the non-diminishment standard." And the plaintiffs acknowledged in their pretrial brief that the Legislature's "Plan 8015"—the backup district in the redistricting bill vetoed by the Governor—was "the only remedial district that the parties have contemplated thus far."[4] Having chosen that path, the plaintiffs are limited to the remedy that they proposed in the trial court.

The question, then, is whether the plaintiffs proved that the Plan 8015 remedial district is not race-predominant. They did not. As we have explained, the Supreme Court's cases say that race predominates in the drawing of a district when the legislature has

---

4. In a footnote in its final order, the trial court addressed the Duval-only district included in Plan 8019 of the redistricting bill that was vetoed by the Governor. In the trial court, the plaintiffs did not advocate that district as a remedy, so we will not consider it here. We note another judge's observation that, "although the Duval-only district itself is relatively compact, it creates a decidedly noncompact surrounding district." *Common Cause Fla. v. Byrd,* 726 F. Supp. 3d 1322, 1389 (N.D. Fla. 2024) (Winsor, J., concurring in part and concurring in the judgment).

"subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 916.

At a minimum, judged by our Court's precedent, the Plan 8015 remedial district fails to comply with the FDA's compactness requirement. Plan 8015 made only modest changes to Benchmark CD 5. And our Court already acknowledged in *Apportionment VII* and *VIII* that Benchmark CD 5 was not compact. *Apportionment VII*, 172 So. 3d at 406; *Apportionment VIII*, 179 So. 3d at 272-73. Plus, in *Apportionment I* we invalidated for non-compactness a state senate district in the western panhandle that was shaped much like Benchmark CD 5 and had similar numerical compactness scores. 83 So. 3d at 663-65.

The inference is inescapable that the Plan 8015 remedial district subordinates the FDA's race-neutral districting principles to racial considerations. There is no plausible, non-racial explanation for using a nearly two-hundred-mile-long land bridge to connect the black populations of Jacksonville and Tallahassee. Nor can the plaintiffs offer a plausible non-racial justification for the way the proposed remedial district carves up those cities. The plaintiffs do not maintain that the district's non-compact shape is caused by a

desire to accommodate the FDA's other criteria, including population equality and use of political and geographical boundaries. *See* art. III, § 20(c), Fla. Const. (no priority of standards within each subsection). Indeed, Plan 8015's remedial district materially copies Benchmark CD 5, which itself was chosen for the overriding purpose of drawing a black-voter-performing district to replace the Corrine Brown district. *See Apportionment VII*, 172 So. 3d at 403 ("In fact, an East-West orientation is the only alternative option" to avoid diminishment.).

One important consequence of the FDA was to take away the Legislature's discretion to employ certain traditional districting principles that might explain the shape of a district that only *appears* race-predominant. For example, the Supreme Court recognizes "incumbency protection" and "political affiliation" as traditional districting principles, but the FDA prohibits those considerations. *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015). And, under the FDA, the traditional districting principle of respect for communities of interest may not "come at the expense of complying with constitutional imperatives, such as compactness." *Apportionment I*, 83 So. 3d at 664.

The plaintiffs invoke the trial court's finding that race would not predominate in the Plan 8015 version of Benchmark CD 5, but that finding was predicated on legal error. At the threshold, the trial court erred by allocating to the defendants the burden of proof on non-predominance. The trial court also appeared to assume that our *Apportionment VII* and *VIII* decisions had found Benchmark CD 5 to be compact, when the opposite is true. Finally, as a baseline for assessing compactness, the trial court compared Benchmark CD 5 to a North Florida district in the Legislature's 2002 congressional plan, which of course was not governed by the FDA's prohibitions on political favoritism and the drawing of non-compact districts.

In fairness, we acknowledge our Court's role in leading the trial court astray. Benchmark CD 5 originated in an order from our Court, and the things that make the Plan 8015 remedial district race-predominant are equally true of Benchmark CD 5. Unfortunately, we and the parties in *Apportionment VII* and *VIII* proceeded as if any race-based districting decision that would pass constitutional muster under Section 5 of the Voting Rights Act would also survive strict scrutiny if undertaken to comply with the

Non-Diminishment Clause. *See also Apportionment I*, 83 So. 3d at 627 (cautioning against "racial gerrymandering," but only in the context of complying with the narrow tailoring requirement). For the reasons we have explained, that is wrong. And we must not compound our error in this case. *Cf. Allen v. Milligan*, 599 U.S. 1, 22 (2023) (rejecting the notion that "a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan").

We respectfully disagree with our dissenting colleague's argument that we must remand this case to the trial court to give the plaintiffs another opportunity to prove the possibility of drawing a North Florida district that is both non-diminishing (measured by our FDA precedents) and non-race-predominant. In the trial court proceedings that already occurred, the plaintiffs proposed only one remedy—a district configured like Benchmark CD 5. For the reasons we have explained, the record leaves no doubt that such a district would be race-predominant. The record also gives us no reasonable basis to think that further litigation would uncover a potentially viable remedy. The experience of Florida's 2010 and 2020 redistricting cycles—not to mention the history of the Corrine

- 46 -

Brown district before the enactment of the FDA—shows that it is likely impossible to draw a non-diminishing district (again, as our precedents understand that concept) in North Florida without subordinating the FDA's mandatory race-neutral districting standards. Under these circumstances—including the plaintiffs' voluntary decision to litigate this case based on a stipulated record—there is no justification for prolonging uncertainty over the validity of the Enacted Plan.

Finally, we conclude by emphasizing that the defendants have not asked us to decide whether every district intentionally drawn to comply with this Court's interpretation of the Non-Diminishment Clause is necessarily race-predominant and therefore subject to strict scrutiny, even if the district satisfies the FDA's race-neutral standards. That issue can wait for another day. *Compare Ala. Legis. Black Caucus*, 575 U.S. at 275 (declining to express a view on "whether the intentional use of race in redistricting, even in the absence of proof that traditional districting principles were subordinated to race, triggers strict scrutiny"), *with League of United Latin Am. Citizens*, 548 U.S. at 517 (Scalia, J., concurring in the judgment in part and dissenting in part) ("[W]hen

a legislature intentionally creates a majority-minority district, race is necessarily its predominant motivation[,] and strict scrutiny is therefore triggered."). In this case, the only remedial district the plaintiffs proposed in the trial court does not comply with the FDA's compactness requirement, and the plaintiffs have not established a non-race-based reason for the conflict.

V

The Legislature's obligation to comply with the Equal Protection Clause is superior to its obligation to comply with the Non-Diminishment Clause as interpreted by our Court. The plaintiffs did not prove the possibility of complying with both the Non-Diminishment Clause and the Equal Protection Clause in North Florida. Therefore, they did not meet their burden to prove the invalidity of the Enacted Plan. We affirm the judgment below, but not the district court's reasoning.

It is so ordered.

COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., dissents with an opinion.
CANADY, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., dissenting.

The Enacted Plan violates the Non-Diminishment Clause of the Florida Constitution because it "not just diminished," it "eliminated" Benchmark CD 5, "[a] historically performing benchmark district for Black voters." *Sec'y of State Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 375 So. 3d 335, 381 (Fla. 1st DCA 2023) (Bilbrey, J., dissenting). The majority generally does not dispute this conclusion, stating: "The ground we have covered so far establishes that, applying this Court's precedents, (1) Benchmark CD 5 was a protected ability-to-elect district for black voters, and (2) the Enacted Plan diminishes that ability to elect." Majority op. at 32.

And yet, despite the majority's agreement that the Enacted Plan diminishes the ability of black voters in Benchmark CD 5 to elect representatives of their choice—thus, the Enacted Plan violates the Fair Districts Amendment (FDA) approved by Florida voters in 2010—the majority ultimately concludes that no relief is warranted in this case because the Plan 8015 remedial district violates the Equal Protection Clause. I dissent.

I.

Today's decision is highly consequential.  For the first time, in response to the issue of equal protection being raised in the trial court, this Court considers the relationship between the Non-Diminishment Clause and the Equal Protection Clause.  Given the significance of this decision, the proper course is to remand this case for a trial on the equal protection issue of non-predominance.

My disagreement with the majority opinion is two-fold.  First, I disagree with the majority's allocation of the burden of proof to Petitioners.  Second, I disagree with the majority's failure to remand this case to the trial court.

A. Burden of Proof

Concluding that the trial court did not apply the correct burden of proof to the plaintiffs, the majority states: "[T]he plaintiffs bore the burden of proving the possibility of drawing a North Florida district that is both non-diminishing and non-race-predominant. And the plaintiffs had to do so with an alternative map."  Majority op. at 41.

In the trial court, Respondents (then-Defendants) raised equal protection as an affirmative defense to Petitioners' non-

diminishment claim. Consequently, once Petitioners established that the Enacted Plan violated the Non-Diminishment Clause, it was Respondents' burden to prove that no possible district could be drawn that complies with both the FDA and the Equal Protection Clause. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995) (explaining that the party alleging that race predominated in redistricting bears the burden of proof on that issue); *Custer Med. Ctr. v. United Auto. Ins. Co.*, 62 So. 3d 1086, 1096 (Fla. 2010) ("The defendant has the burden of proving an affirmative defense.").

## B. Trial Court Remand

The circumstances involved here warrant remanding this case for trial. The majority observes that "[o]rdinarily, the plaintiffs in a case like this would present an alternative map at trial where the map and its creator would be subject to adversarial testing." Majority op. at 41. In this case, however, there was a *joint* agreement to forgo a trial, and the trial court accepted multiple *joint* stipulations. What is more, even this Court has its share of responsibility in how this case evolved. The majority candidly acknowledges:

> In fairness, we acknowledge our Court's role in leading the trial court astray. Benchmark CD 5 originated in an order from our Court, and the things that make the Plan 8015 remedial district race-predominant are equally true of Benchmark CD 5. Unfortunately, we and the parties in *Apportionment VII* and *VIII* proceeded as if any race-based districting decision that would pass constitutional muster under Section 5 of the Voting Rights Act would also survive strict scrutiny if undertaken to comply with the Non-Diminishment Clause.

Majority op. at 45-46.

While I disagree with the majority's allocation of the burden of proof in this case, even following the majority's reasoning, a remand is the correct remedy because the majority has concluded that the trial court relied on the wrong burden of proof. "Under the well-established framework for appellate review, if an appellate court determines that the trier of fact has placed the burden of proof on the wrong party, the case should be remanded to the trier of fact to reevaluate the evidence in light of the correct legal rule regarding the burden of proof." *League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 423 (Fla. 2015) (Canady, J., dissenting). Indeed, "[t]he weighing of the evidence under the applicable burden of proof is the function of the trier of fact," and "[t]hat function should not be usurped by an appellate court." *Id.* Because "[t]he Supreme

Court has recognized . . . that 'fact finding is the basic responsibility of [trial] courts, rather than appellate courts,' . . . 'where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue.' " *Id.* (alteration in original) (quoting *Pullman-Standard v. Swint,* 456 U.S. 273, 291-92 (1982)).  Given the absence of traditional evidentiary proceedings, I reject any conclusion that the existing record "permits only [the majority's] resolution of the factual issue." *Id.* (quoting *Pullman-Standard,* 456 U.S. at 292).

For these reasons, even if Petitioners bore the burden on the issue of equal protection and were responsible for proving that race does not predominate the Plan 8015 remedial district, Petitioners must be allowed the opportunity to make that showing upon remand to the trial court.[5]

---

[5]  I recognize the challenges involved in conducting a trial at this point, just as I recognize that the Enacted Plan has now been in place for the 2024 congressional election cycle.  However, I believe that the unique circumstances of this case require that this case be remanded to the trial court.  Faithful application of our *Apportionment* decisions requires us to proceed on "a reliable course for the Legislature and the judiciary to follow in the future."  *See*

## II.

Although the majority conducts an as-applied equal protection analysis, make no mistake—this decision lays the groundwork for future decisions that may render the Non-Diminishment Clause practically ineffective or, worse, unenforceable as a matter of law. *See* majority op. at 47 ("[T]he defendants have not asked us to decide whether every district intentionally drawn to comply with this Court's interpretation of the Non-Diminishment Clause is necessarily race-predominant and therefore subject to strict scrutiny, even if the district satisfies the FDA's race-neutral standards. That issue can wait for another day.").

## III.

When this case was before the First District Court of Appeal in 2023, its complexity was compounded by the then-approaching 2024 congressional election. Because of the obvious need to expedite this important matter for an ultimate resolution once it left the trial court, I agree with the majority's critique of the First

---

majority op. at 23-24 (quoting *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 684 (Fla. 2012)).

District's refusal to pass through the appeal of the trial court's judgment to this Court despite the parties' *joint* request in September 2023 that the district court do so. *See* art. V, § 3(b)(5), Fla. Const.

Exercising pass-through jurisdiction would not have been an act of surrendering the district court's jurisdiction to this Court— quite the contrary. Submitting the case for this Court's consideration under section 3(b)(5) would have been an acknowledgment of the import of deciding this case in a timely manner. This was a case that was all but likely to reach this Court one way or the other—and it did—far later than it should have. *See Byrd*, 375 So. 3d at 371 (Bilbrey, J., dissenting) ("We knew when the suggestion for pass-through was before us in September [2023] that the Florida Supreme Court would likely have jurisdiction no matter how we ruled on the appeal."). By declining to certify the trial court's judgment for immediate resolution and instead deciding the case on the merits, the district court injected an unacceptably lengthy delay in getting this important matter before this Court.

IV.

In conclusion, because Petitioners demonstrated that the Enacted Plan violates the non-diminishment provision of the Florida Constitution, this Court should remand this case for an actual trial on Respondents' equal protection affirmative defense. Even under the majority's conclusion—that Petitioners bore the burden to prove a potential redistricting map that complies with both the FDA and the Equal Protection Clause—Petitioners are entitled to an opportunity to make that showing on remand.

By foreclosing further litigation, the majority's decision now allows to remain in place a congressional redistricting plan that is unconstitutional under the Florida Constitution. For these reasons, I dissent.

Application for Review of the Decision of the District Court of Appeal
   Direct Conflict of Decisions/Class of Constitutional Officers

   First District – Case No. 1D2023-2252

   (Leon County)

Frederick S. Wermuth, Thomas A. Zehnder, and Quinn B. Ritter of King, Blackwell, Zehnder & Wermuth, P.A., Orlando, Florida; Christina A. Ford and Julie Zuckerbrod of Elias Law Group LLP, Washington, District of Columbia; and Abha Khanna of Elias Law Group LLP, Seattle, Washington,

for Petitioners

James Uthmeier, Attorney General, Jeffrey P. DeSousa, Acting Solicitor General, David M. Costello, Chief Deputy Solicitor General, and Daniel Bell, Chief Deputy Solicitor General, Tallahassee, Florida,

for Respondent Cord Byrd, in his official capacity as Florida Secretary of State

Daniel E. Nordby, George N. Meros, Jr., and Tara R. Price of Shutts & Bowen LLP, on behalf of the Florida Senate, Tallahassee, Florida; and Carlos Rey of the Florida Senate, Tallahassee, Florida; and Andy Bardos of GrayRobinson, P.A., on behalf of the Florida House of Representatives, Tallahassee, Florida,

for Respondents Florida Senate and Florida House of Representatives

Mohammad O. Jazil, Gary V. Perko, Ed Wenger, and Michael Beato of Holtzman Vogel Baran Torchinsky & Josefiak, Tallahassee, Florida; and Bradley R. McVay, Joseph S. Van de Bogart, and Ashley Davis, Florida Department of State, Tallahassee, Florida,

for Respondent Florida Department of State

Matthew A. Goldberger of Matthew A. Goldberger, P.A., West Palm Beach, Florida; and Jonathan B. Miller and Sophia House of Public Rights Project, Oakland, California,

for Amici Curiae Current and Former Elected Leaders of North Florida and across the state

Elizabeth B. Wydra, Brianne J. Gorod, David H. Gans, and Anna K. Jessurun of Constitutional Accountability Center, Washington, District of Columbia; and Linda K. Clark of Morrison & Foerster LLP, Miami, Florida,

for Amicus Curiae Constitutional Accountability Center